UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re Peteski Productions, Inc. and | § | |
| Philip C. McGraw, PhD, | § | |
| | § | |
| *Petitioners*. | § | Case No. _____ |
| | § | |
| | § | |
| | § | |

On Petition for Writ of Mandamus to the
United States District Court for the Northern District of Texas
Bankruptcy Case No. 25-80156-swe-11

**PETITION FOR WRIT OF MANDAMUS**

Bruce J. Ruzinsky (TBN 17439425)
Matthew D. Cavenaugh (TBN 24062656)
JACKSON WALKER LLP
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone: (713) 752-4200
Email: bruzinsky@jw.com
Email: mcavenaugh@jw.com

Charles L. Babcock (TBN 01479500)
Christopher Bankler (TBN 24066754)
Minoo S. Blaesche (TBN 24075102)
JACKSON WALKER LLP
2323 Ross Avenue, Suite 600
Dallas, TX 75201
Telephone: (214) 953-6000
Email: cbabcock@jw.com
Email: cbankler@jw.com
Email: mblaesche@jw.com

Nathan L. Hecht (TBN 00000023)
Jeffrey L. Oldham (TBN 24051132)
Adam W. Aston (TBN 24045423)
JACKSON WALKER LLP
100 Congress Avenue, Suite 1100
Austin, TX 78701
Telephone: (512) 236-2000
Email: nhecht@jw.com
Email: joldham@jw.com
Email: aaston@jw.com

*Counsel for Petitioners Peteski Productions, Inc. and Phillip C. McGraw, PhD*

## NOTICE OF INTERESTED PARTIES

The Respondents/Interested Parties to this Petition for Writ of Mandamus are as follows:

**Bankruptcy Court: Hon. Scott W. Everett**

Earle Cabell Federal Building
1100 Commerce St., Rm. 1421
Dallas, Texas 75242-1496
(214) 753-2071
swe_settings@txnb.uscourts.gov

**Debtor and Debtor in Possession: Merit Street Media, Inc.**

| | |
|---|---|
| Thomas R. Califano | Stephen E. Hessler |
| Jeri Leigh Miller | Patrick Venter |
| SIDLEY AUSTIN LLP | SIDLEY AUSTIN LLP |
| 2021 McKinney Avenue, Suite 2000 | 787 Seventh Avenue |
| Dallas, Texas 75201 | New York, New York 10019 |
| (214) 981-3300 | (212) 839-5300 |
| tom.califano@sidley.com | shessler@sidley.com |
| jeri.miller@sidley.com | pventer@sidley.com |

James W. Ducayet
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois
(312) 853-7000
jducayet@sidley.com

**Other Interested Parties:**

**TBN/Trinity Broadcasting of Texas, Inc. and TCT Ministries, Inc.**

| | |
|---|---|
| Mark C. Moore | Rajiv Dharnidharka |
| FOLEY & LARDNER, LLP | FOLEY & LARDNER, LLP |
| 2021 McKinney Avenue, Suite 1600 | 555 California Street, Suite 1700 |
| Dallas, Texas 75201 | San Francisco, California 94104 |
| (214) 999-4150 | (415) 434-4484 |
| mmoore@foley.com | rajiv.dhardnidharka@foley.com |

ii

**Professional Bull Riders, LLC**

Jason M. Rudd
WICK & PHILLIPS GOULD & MARTIN, LLP
3131 McKinney Avenue, Suite 500
Dallas, Texas 75204
(214) 692-6200
jason.rudd@wickphillips.com

Alyssa A. Moscarino
BENESCH, FRIEDLANDER, COPLAN & ARONOFF
127 Public Square, Suite 4900
Cleveland, Ohio 44144
(216) 363-4500
amoscarino@beneschlaw.com

**Official Committee
    of Unsecured Creditors**

Greg Wilkes
Lou Strubeck Jr.
O'MELVENY & MYERS, LLP
2801 North Harwood Street, Suite 1600
Dallas, Texas 75201-2692
(972) 360-1935
gwilkes@omm.com
lstrubeckjr@omm.com

**United States Trustee's Office**

Asher Bublick
Kendra Rust
Meredyth Kippes
OFFICE OF THE UNITED STATES TRUSTEE
1100 Commerce Street, Room 976
Dallas, Texas 75242
(214) 767-8967
asher.bublick@usdoj.gov
elizabeth.a.young@usdoj.gov
kendra.rust@usdoj.gov
meredyth.kippes@usdoj.gov
susan.hersh@usdoj.gov
erin.schmidt2@usdoj.gov
ustpregion06.da.ecf@usdoj.gov

**Chapter 7 Trustee**

Daniel J. Sherman
SHERMAN & YAQUINTO, LLP
509 N. Montclair Ave.
Dallas, Texas 75208
(214) 942-5502
djsherman@syllp.com

/s/ *Christopher Bankler*
Christopher Bankler

### TABLE OF CONTENTS

Introduction .......................................................................................................... 1

Background .......................................................................................................... 4

I.     Factual Background ...................................................................................... 4

II.    Procedural History ....................................................................................... 6

Standard of Review ............................................................................................. 9

Reasons for Granting the Writ ........................................................................... 11

I.    Petitioners have a clear and indisputable right to the writ because the bankruptcy court proceedings were riddled with due-process violations and procedural errors that demonstrate clear abuses of discretion ...................................................... 11

II.    Petitioners have a clear and indisputable right to the writ because the bankruptcy court abused its discretion with each of its four purported "cause" grounds .................... 13

    A.    Ground 4—Dr. McGraw's text message and alleged bad-faith prosecution of the bankruptcy case—is legally flawed, violated important rights, rests on clearly erroneous fact findings, and is otherwise an abuse of discretion .......... 13

        1.    No legal authority supports alleged deletion of a text message as a cause ground under the Bankruptcy Code, whether as bad-faith prosecution or otherwise .......................................................... 14

        2.    The bankruptcy court's due-process violations and other procedural errors, in findings related to a supposedly deleted text message, warrant mandamus relief ........................................................... 17

        3.    Ground 4, originally and as amended, also rests on clearly erroneous factual findings and is legally flawed for other reasons ........................... 24

        4.    All statements and findings relating to ground 4 should be stricken or vacated ...................................................................................... 30

        5.    This requested relief can and should be granted regardless of the Court's determination on the other issues .................................... 31

    B.    Ground 3—the chief restructuring officer's alleged candor—is legally flawed, violated important rights, and rests on clearly erroneous fact findings ....................................................................... 32

C.    Ground 2—neutrality of the chief restructuring officer—is legally flawed, rests on clearly erroneous fact findings, and is otherwise an abuse of discretion ................................................................................................37

D.    Ground 1 also is legally flawed, rests on clearly erroneous fact findings, and is otherwise an abuse of discretion ........................................................41

III.    Mandamus relief is appropriate under the circumstances of this case ..............................44

IV.    Mandamus is warranted because there is not an adequate appellate remedy ...................44

Prayer ........................................................................................................................50

v

TABLE OF AUTHORITIES

## Cases

*In re Advanced Modular Power Sys., Inc.*,
  413 B.R. 643 (Bankr. S.D. Tex. 2009), *aff'd sub nom. Hsu v. West*,
  2009 WL 7760300 (S.D. Tex. Dec. 30, 2009) ................................................................15, 28

*Albemarle Paper Co. v. Moody*,
  422 U.S. 405 (1975) ..........................................................................................................10

*Armstrong v. Manzo*,
  380 U.S. 545 (1965) ..........................................................................................11, 17, 22

*In re Avantel, S.A.*,
  343 F.3d 311 (5th Cir. 2003) ...........................................................................................44

*Bd. of Trs. v. Gabriel, Roeder, Smith & Co.*,
  529 F.3d 506 (5th Cir. 2008) ......................................................................................37, 38

*In re Black Elk Energy Offshore Operations, LLC*,
  2016 WL 4055044 (Bankr. S.D. Tex. July 26, 2016) ......................................................34

*In re BMI Oldco*,
  671 B.R. 215 (Bankr. S.D. Tex. 2025) .............................................................................42

*In re Bodenheimer, Jones, Szwak, & Winchell L.L.P.*,
  592 F.3d 664 (5th Cir. 2009) ...........................................................................................49

*Bose Corp. v. Consumers Union of U.S., Inc.*,
  466 U.S. 485 (1984) .............................................................................16, 25, 36, 39

*In re Carr*,
  321 B.R. 702 (E.D. Va. 2005) ..........................................................................................49

*Cheney v. U.S. Dist. Ct.*,
  542 U.S. 367 (2004) .....................................................................................................9, 44

*CHS, Inc. v. Plaquemines Holdings, L.L.C.*,
  735 F.3d 231 (5th Cir. 2013) ......................................................................................41, 42

*Clark v. Sweeney*,
  607 U.S. ___, 2025 WL 3260170 (Nov. 24, 2025) ....................................12, 17, 18, 20, 21, 22

*Cont'l Box Co. v. N.L.R.B.*,
  113 F.2d 93 (5th Cir. 1940) ..............................................................................................23

*In re Correra*,
589 B.R. 76 (Bankr. N.D. Tex. 2018) .............................................................15, 28

*In re CTLI, Inc.*,
528 B.R. 359 (Bankr. S.D. Tex. 2015) .....................................................15, 27, 29

*Dailey v. Vought Aircraft Co.*,
141 F.3d 224 (5th Cir. 1998) .......................................................................32, 49

*In re Dairy Mart Convenience Stores, Inc.*,
351 F.3d 86 (2d Cir. 2003)...................................................................................33

*In re Depuy Orthopedics, Inc.*,
870 F.3d 345 (5th Cir. 2017) .............................................................................10

*In re First S. Sav. Ass'n*,
820 F.2d 700 (5th Cir. 1987) ......................................................................3, 45, 49

*In re Ford Steel, LLC*,
629 B.R. 871 (Bankr. S.D. Tex. 2021) ..............................................................16

*Fromson v. Citiplate, Inc.*,
886 F.2d 1300 (Fed. Cir. 1989)....................................................................30, 46

*Gardiner v. A.H. Robins Co.*,
747 F.2d 1180 (8th Cir. 1984) .....................................................................30, 46

*Hartman Comm. Props. REIT v. Hartman*,
2007 WL 9751970 (S.D. Tex. Apr. 6, 2007), *aff'd*, 252 F. App'x 631
(5th Cir. 2007)....................................................................................................38

*In re Highland Capital Mgmt., L.P.*,
74 F.4th 361 (5th Cir. 2023) .............................................................................48

*In re HONX, Inc.*,
2022 WL 17984313 (Bankr. S.D. Tex. Dec. 28, 2022) .................................41, 42

*In re JPMorgan Chase & Co.*,
916 F.3d 494 (5th Cir. 2019) ......................................................................45, 50

*Loop Corp. v. U.S. Tr.*,
379 F.3d 511 (8th Cir. 2004) .............................................................................41

*In re MatlinPatterson Glob. Opportunities Partners II L.P.*,
644 B.R. 418 (Bankr. S.D.N.Y. 2022)...............................................................42

*McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords. of Jud.
Conf.*, 264 F.3d 52 (D.C. Cir. 2001) ................................................................48

*Miller v. Dunn,*
   774 F. Supp. 3d 806 (N.D. Tex. 2024) ...................................................25, 26, 30

*In re Mirant Corp.,*
   378 F.3d 511 (5th Cir. 2004) ...........................................................18, 33

*In re Modern VideoFilm, Inc.,*
   2019 Bankr. LEXIS 3317 (Bankr. C.D. Cal. Sep. 26, 2019)..................................42

*Nisus Corp. v. Perma-Chink Sys., Inc.,*
   497 F.3d 1316 (Fed. Cir. 2007)........................................................46

*Parker v. Bill Melton Trucking, Inc.,*
   2017 WL 726909 (N.D. Tex. Feb. 24, 2017)........................................25, 26, 30

*In re Patriot Place, Ltd.,*
   486 B.R. 773 (Bankr. W.D. Tex. 2013) ...................................................34

*Peals v. QuikTrip Corp.,*
   2021 WL 2043185 (E.D. Tex. May 21, 2021).........................................29

*In re Profundity LLC,*
   2024 WL 4249715 (Bankr. S.D. Fla. Apr. 11, 2024) ............................................42

*Pulphus v. Ayers,*
   909 F.3d 1148 (D.C. Cir. 2018)...................................................32, 48, 49

*In re Red River Talc LLC,*
   670 B.R. 251 (Bankr. S.D. Tex. 2025) ...................................................41

*In re Salem Suede, Inc.,*
   221 B.R. 586 (D. Mass. 1998) ...................................................47

*In re San Patricio Cnty. Comm. Action Agency,*
   575 F.3d 553 (5th Cir. 2009) ...................................................49

*In re Soundview Elite, Ltd.,*
   503 B.R. 571 (Bankr. S.D.N.Y. 2014)...................................................41

*In re Tennant,*
   318 B.R. 860 (B.A.P. 9th Cir. 2004)...................................................33

*In re Tribune Media Co.,*
   2019 WL 643734 (D. Del. Feb. 15, 2019)...................................................17

*U.S. Lines Co. v. MacMahon,*
   285 F.2d 212 (2d Cir. 1960)...................................................11, 45, 47

*United States v. Sineneng-Smith*,
    590 U.S. 371 (2020)..................................................................16, 17, 18, 20, 21, 22

*United States v. Smith*,
    2024 WL 516677 (E.D. Mo. Feb. 9, 2024)......................................................34, 35

*United States v. Sutton*,
    786 F.2d 1305 (5th Cir. 1986) .................................................................................18

*In re V Cos.*,
    274 B.R. 721 (Bankr. N.D. Ohio 2002).............................................................32, 33

*In re Volkswagen of Am., Inc.*,
    545 F.3d 304 (5th Cir. 2008) ..........................................10, 11, 14, 40, 41, 43, 44

*In re Williams*,
    156 F.3d 86 (1st Cir. 1998).................................................11, 30, 37, 41, 45, 46, 47

*In re Zale Corp.*,
    62 F.3d 746 (5th Cir. 1995) .........................................................................15, 27, 29

## Statutes

11 U.S.C. § 105(a) .......................................................................................................33

11 U.S.C. § 363...........................................................................................................38

11 U.S.C. § 1112.........................................................................................................40

11 U.S.C. § 1123.........................................................................................................41

28 U.S.C. § 1651.........................................................................................................30

## Other Authorities

Federal Rule of Bankruptcy Procedure 7001 ...................................................15, 27, 29

Federal Rule of Civil Procedure 37 ...........................................................................29

RELIEF SOUGHT

Petitioners Peteski Productions, Inc. ("Peteski") and Phillip C. McGraw, PhD ("Dr. McGraw") (collectively "Petitioners") respectfully request that the Court grant as mandamus relief the following actions (directly or by ordering the bankruptcy court to so act):

1.      reverse or vacate the bankruptcy court's conversion order (Dkt. 632) and all underlying or otherwise related orders, rulings, findings, and conclusions (including the oral ruling (Dkt. 582) and memorandum decision (Dkt. 630)), either in full—and thus reverse the decisions below, deny the motions to dismiss in their entirety, and remand for Chapter 11 proceedings—or alternatively in part;

2.      strike or vacate each of the "cause" grounds asserted by the bankruptcy court—as supposed bases to dismiss the bankruptcy case, convert it to Chapter 7, or appoint a Chapter 11 trustee—that this Court finds were improperly entered; and

3.      strike, vacate, and/or expunge all statements and findings by the bankruptcy court in the conversion order (Dkt. 632), oral ruling (Dkt. 582), memorandum decision (Dkt. 630), order setting precautionary due-process hearing (Dkt. 599) and other related decisions, that (a) relate to Dr. McGraw's alleged deletion of a text message; (b) relate to Dr. McGraw's or Peteski's alleged actions in relation to the filing of or prosecution of this bankruptcy case; (c) relate to the chief restructuring officer's supposed lack of neutrality or candor as it concerns Dr. McGraw; or (d) otherwise support "cause" grounds 2–4 asserted by the bankruptcy court.

## RELATED CASES

The bankruptcy court's conversion order, and all underlying or otherwise related orders, rulings, findings, and conclusions, that are challenged in this mandamus petition are also the subject of two appeals pending before Judge Sam A. Lindsay:

- *Merit Street Media, Inc., et al. v. Trinity Broadcasting of Texas, Inc., et al.*, No. 3:25-cv-03186-L; and

- *Peteski Productions, Inc., et al. v. Trinity Broadcasting of Texas, Inc., et al.*, No. 3:25-cv-03190-L.

In this petition, citations to documents filed in the Merit Street Media appeal will be made as follows: MSM Dkt.__. Citations to documents filed in the Peteski Productions appeal will be made as follows: Peteski Dkt.__. All references are to the ECF page number.

In this petition, citations to documents in the separately filed Mandamus Record will be designated as MR__.

## Issues Presented

1.  Whether the bankruptcy court clearly abused its discretion in converting this Chapter 11 case to Chapter 7; in finding "cause" to support conversion, dismissal of this case, or appointment of a Chapter 11 trustee; or in any of the court's decisions, findings of fact, conclusions of law, or other rulings that led to its ultimate decisions on "cause" and on the propriety of conversion.

2.  Whether the bankruptcy court legally erred, violated due-process rights, made clearly erroneous fact findings, or otherwise clearly abused its discretion in determining there is "cause" for conversion or other relief in each of the court's four asserted cause grounds, including ground 4 that Dr. McGraw allegedly purposefully deleted a text message or engaged in bad-faith prosecution of the bankruptcy case, and grounds 2 and 3 that the chief restructuring officer was not candid in his testimony and was not a neutral fiduciary.

3.  Whether the bankruptcy court's findings of fact or other statements relating to the four cause grounds are clearly erroneous or otherwise flawed, including all findings and statements relating to the alleged intentional deletion of a text message by Dr. McGraw, to the alleged bad-faith filing or prosecution of the bankruptcy case by Dr. McGraw or Peteski, or to the chief restructuring officer's alleged lack of candor or failure to act as a neutral fiduciary.

4.  Whether the mandamus relief requested is appropriate and warranted in this case, including because there is no adequate appellate remedy, based on the bankruptcy court's clear abuses of discretion.

## Introduction

Petitioners Peteski and Dr. McGraw seek mandamus relief from bankruptcy court rulings and a conversion order that were riddled with due-process violations, multiple legal errors, clearly erroneous findings, and other abuses of discretion.

In the underlying bankruptcy case, the debtor is Merit Street Media, Inc. ("MSM" or "Debtor"), a media joint venture that Petitioner Peteski—which owns the market-leading show *Dr. Phil* and is owned by Petitioner Dr. Phil McGraw—co-founded in 2023 with Trinity Broadcasting of Texas, Inc. and TCT Ministries, Inc. (collectively, "Trinity"). MSM fell into dire financial straits quickly, in part due to being saddled with more than $130 million in total liabilities by Trinity. The parties in 2024 agreed to a restructuring that led to Dr. McGraw being MSM's sole board member and Peteski pumping in millions of dollars of emergency funding in an attempt to save MSM. But ultimately, MSM appointed Gary Broadbent as an independent director to identify MSM's best path forward, and he determined that seeking Chapter 11 protection was the proper solution.

But shortly after this Chapter 11 case was initiated, Trinity filed a motion seeking dismissal of the case, conversion to Chapter 7, or appointment of a Chapter 11 trustee. Professional Bull Riders LLC ("PBR"), an MSM creditor, partially joined Trinity's motion and sought conversion. After months of discovery and a trial, the bankruptcy court read an oral ruling ("Ruling") in which it announced four grounds that it determined each provide "cause" for conversion, dismissal, or appointment of a Chapter 11 trustee. Among the court's asserted grounds, "cause" ground 4 found that Dr. McGraw had intentionally deleted a text message, which the court called a destruction of estate property. Based on the "cause" grounds, the court resolved to convert the case to Chapter 7. Following another month of proceedings, including stay briefing and a supposed "due process" hearing, the court entered an order converting the case to Chapter 7 ("Conversion Order") and issued a "Memorandum Decision" that, *inter alia*, supplemented and amended the Ruling—

including by announcing a "more comprehensive fourth cause" ground that the alleged deletion of a text constituted "[b]ad-faith conduct in the prosecution of this bankruptcy case by [Dr.] McGraw, acting for the Debtor." Dr. McGraw, Peteski, and MSM have each appealed the Conversion Order and all related decisions, and those appeals are currently pending before Judge Lindsay.

Dr. McGraw was a witness, not a party, in the bankruptcy proceeding. But he is entitled to relief from the bankruptcy court's Conversion Order and all related rulings because they singled him out with inflammatory findings and statements that were legally off-base and completely unsupported by the evidence, untethered to any statutory "cause" grounds asserted for the relief awarded or requested, and gratuitous to the rulings below. Moreover, the court's findings and statements about Dr. McGraw, if not vacated, operate as an improper sanction, cause reputational and brand harm (among other harms), and risk collateral consequences, including potential effects on future litigation between these parties. Peteski, meanwhile, is both a creditor and a majority-equity owner of Debtor MSM and was the Debtor's DIP Lender for several months while the Chapter 11 proceeding was active. Peteski participated in the bankruptcy proceeding—not as a party, but as creditor, owner, and DIP Lender—and therefore at least suffers direct pecuniary impacts from the adverse rulings below.

While Petitioners have appealed from the adverse rulings, they file this mandamus petition to ensure their ability to fully challenge those rulings. One type of relief Petitioners seek here is to expunge from the public record the bankruptcy court's erroneous rulings and findings that cause them reputational and professional harm, which is generally not available in an appeal. Petitioners also seek at least *partial* reversal or vacatur of the cause findings below, which may not be available on appeal. Further, Trinity and PBR are challenging Petitioners' standing to appeal from any of the rulings in the first place. Even if Petitioners have standing, Trinity and PBR appear likely also to

claim the appeal will become equitably moot upon the completion of the Chapter 7 liquidation process if no stay is granted during the appeal. *See* Peteski Dkt. 22 at 6–9, 27; MSM Dkt. 23 at 25–26, 50. Petitioners strongly disagree with Trinity's and PBR's positions (or likely positions) on standing and mootness in the appeal, but seek mandamus relief in part out of an abundance of caution in case the district court there may later decide Petitioners have no right of appeal—which would satisfy the no-adequate-appellate-rights prong of the mandamus analysis.

Specifically, Dr. McGraw and Peteski ask for mandamus relief to accomplish the complete reversal of the Conversion Order and all related orders, rulings, findings, and conclusions, or alternatively the partial vacatur of parts of those decisions. Petitioners request that each of the four asserted "cause" grounds, especially grounds 2–4, be stricken or vacated. And Petitioners ask to have stricken, vacated, and/or expunged all statements and findings by the court, in the Conversion Order or related orders, that pertain to (a) Dr. McGraw's alleged deletion of a text message; (b) Dr. McGraw or Peteski's alleged actions related to the filing or prosecution of the bankruptcy case; (c) the supposed lack of neutrality or candor, as it concerns Dr. McGraw, by the chief restructuring officer ("CRO") Gary Broadbent; and (d) asserted cause grounds 2–4 in any other way.

This relief is strongly warranted because, as Petitioners establish below, the bankruptcy court clearly abused its discretion in several significant respects. For example, the Bankruptcy Code does not recognize the court's asserted cause grounds 2–4. The court also raised them *sua sponte* and in violation of Petitioners' due-process and other rights. And none of the four cause grounds relied upon by the bankruptcy court are supported by the facts or the law.

Petitioners satisfy the three conditions required for obtaining mandamus relief. *First*, Petitioners can establish a clear and indisputable right to the writ. The bankruptcy court's rulings made no finding of bad-faith *filing* of the bankruptcy case—the main cause ground pursued by

Trinity and PBR—yet the bankruptcy court set out on its misguided course to *sua sponte* find other grounds to justify its outcome. *Second*, mandamus relief is appropriate under the circumstances of this case. In addition to the bankruptcy court's erroneous decision to convert the proceeding to Chapter 7, the rulings challenged have caused, and will continue to cause, reputational and brand harm to Petitioners if not vacated. *Third*, mandamus is the only way Petitioners can obtain complete relief, fully vindicate their rights, and remedy the ongoing reputational and brand harm, as an appeal may be unavailable to obtain only partial vacatur and is inadequate to strike or expunge all offending parts of the opinion below. And to the extent the appellate court might agree with Trinity and PBR that Petitioners have no appellate rights with respect to the key Conversion Order and all related rulings, then *a fortiori* Petitioners lack adequate means—other than this mandamus petition—by which they may obtain *any* of the relief sought. For all the reasons demonstrated herein, the Court should grant this mandamus petition.

**BACKGROUND**

## I.    Factual Background

In 2022, Trinity sought to launch a for-profit television network and offered Peteski a 30% ownership interest in the new network and additional cash installments over a ten-year period in return for Peteski producing 160 episodes of a new primetime show by Dr. McGraw. MR11205–08. Trinity and Peteski entered into a Joint Venture Agreement ("JVA") in January 2023 setting out those and other terms. *Id.* Trinity was responsible for providing the start-up network with virtually everything except the specific "Dr. Phil" content that Peteski promised to deliver. MR112006–08. The new network was named Merit Street TV, and the joint-venture entity ultimately came to be known as Merit Street Media, Inc., the Debtor in the bankruptcy proceeding.

Prior to the launch of Merit Street TV in April 2024, Trinity negotiated on behalf of MSM numerous distribution agreements to provide the carriage that Trinity had promised in the JVA to

4

transfer to MSM at no cost. *See* MR11205. The monthly cost of these distribution agreements was around $2.6 million, which Trinity funded for only a few months before notifying Peteski in July 2024 that it would no longer fund the distribution agreements, burdening MSM with that expense in breach of one of Trinity's significant JVA obligations. MR4257–58; MR8339; MR11205.

MSM experienced dire financial circumstances almost immediately after launching Merit Street TV, including having been saddled by Trinity with over $130 million in total liabilities. MR4255. By July 2024, the parties began negotiating a new path forward, which ultimately resulted in an August 2024 agreement between Trinity and Peteski in which ownership interests were flipped from the original arrangement: Peteski became MSM's 70% owner, and Trinity became the 30% owner. MR944. Peteski delivered a check to Jim Mittan, the CFO of both MSM and Trinity, in the agreed amount and was issued a stock certificate for its 70% shares of MSM; the check was deposited and cashed for MSM on the same day. MR7186–89.

After Peteski became the majority shareholder, MSM's bylaws were amended to permit a single director, Dr. McGraw became the sole member of MSM's board of directors, and MSM took action to reduce costs and seek more funding. MR7076–90. From August 2024 to May 2025, MSM borrowed over $55 million, including over $25 million from Peteski and $30 million in controvertible promissory notes from others. MR4153; MR4311–12; MR8339–40; MR7623; MR546–47. Despite its financial troubles, MSM successfully produced and broadcast exclusive content during that period, including 225 episodes of "Dr. Phil Primetime." MR7676–77.

In February 2025, Trinity and Peteski signed a Joint Written Consent to convert MSM to a Texas corporation. MR7118–36. In that agreement and amended MSM bylaws, Trinity consented to a single-member board of directors for MSM. *Id.*; MR7076–90. Trinity also approved the Certification of Formation filed with the Texas Secretary of State, in which Dr. McGraw was

publicly named the sole member of MSM's board of directors. MR7133–35. Thus, the record confirms Trinity executed the Joint Written Consent with full knowledge of its declaration and confirmation of Dr. McGraw as MSM's sole director. MR7076–90; MR7118–36; MR4024–25. After MSM was reincorporated in Texas with Dr. McGraw as sole director, Trinity repeatedly acted in accordance with Dr. McGraw's authority and never requested additional directors be appointed to the board or added to the MSM Certificate of Formation. MR4025–26.

Through July 2025, Peteski and Dr. McGraw kept producing new content and MSM's viewership grew, but Trinity refused to make payments it owed Peteski under the JVA, and Peteski was forced to provide millions of dollars of emergency funding to MSM. MR4153, 4311–12; MR8339–40; MR7623; MR546–47. All the while, payments became overdue to more creditors.

In June 2025, MSM's board appointed Gary Broadbent as independent director and sole member of a Special Committee to assess the financial situation and determine MSM's best path forward. MR1060–1063; MR5098–102. The Special Committee subsequently authorized MSM to commence bankruptcy and enter into DIP Lender financing with Peteski. MR5998–6004. The DIP Lender financing arrangement—later approved by the initial presiding bankruptcy judge— intended to finance MSM through resolution of Chapter 11. *See, e.g.*, MR1326; MR3940–42.

## II.    Procedural History

MSM filed a Chapter 11 petition in July 2025 in an effort to manage its financial distress. MR1–14. Peteski, which is owned by Dr. McGraw, remains MSM's majority equity owner and a creditor, and, until the bankruptcy court converted the case to Chapter 7, was MSM's DIP Lender during the case. *See, e.g.*, MR17; MR1326. Broadbent signed and filed the Chapter 11 petition in his role as MSM's CRO. MR1–14.

Two weeks after MSM filed the Chapter 11 petition, Trinity filed a motion seeking to dismiss the case, convert to Chapter 7, or appoint a Chapter 11 trustee. MR321–87. PBR filed a

partial joinder also seeking, *inter alia*, conversion. MR453–466. Peteski and MSM objected to those motions. MR797–970; MR971–1063. But as a result of Trinity's and PBR's filings, the resulting discovery that lasted for two months, and bankruptcy court proceedings that stretched into mid-November, Peteski and its principal, Dr. McGraw, were subjected to an onslaught of print media articles and social-media campaigns promoting Trinity's and PBR's unsubstantiated allegations, and Peteski's DIP lending extended well beyond initial expectations.[1] *See, e.g.*, MR3940–65. Due to the delay, over 300 creditors remain waiting for the opportunity to realize any value from the MSM estate. *E.g.*, MR974.

Before the hearing on the motions to dismiss, MSM's Official Committee of Unsecured Creditors, Peteski, and others reached a negotiated agreement on the "Chapter 11 Plan of Merit Street Media, Inc." ("Chapter 11 Plan"), which was filed with the bankruptcy court for approval. MR2660–2725. Unrebutted evidence at the motion-to-dismiss hearing showed that the Chapter 11 Plan would realize a much greater return for creditors than a Chapter 7 liquidation. MR2981–88.

The bankruptcy court conducted a six-day hearing on Trinity's and PBR's motions in September 2025. On October 28, 2025, the bankruptcy court orally read the Ruling into the record, asserting four grounds for "cause" to dismiss the case, convert to Chapter 7, or appoint a Chapter 11 trustee, and stating the court would convert the case to Chapter 7. MR8900–95. The Ruling's asserted cause grounds were (1) a substantial or continuing loss or diminution to the estate without a likelihood of rehabilitation, (2) the CRO was not a neutral fiduciary, (3) the CRO was not candid in trial testimony, and (4) Dr. McGraw purposefully deleted a text message. MR8961–66.

---

[1] *See, e.g.*, Todd Spangler, *Professional Bull Riders Accuses Dr. Phil of 'Orchestrating' Merit Street Bankruptcy and Forming New Company to Avoid Paying Creditors*, VARIETY (Aug. 8, 2025, 06:05 PT), https://variety.com/2025/tv/news/pbr-dr-phil-orchestrating-merit-street-bankruptcy-envoy-bad-faith-creditors-1236482324/.

The following day, the bankruptcy court entered an *Order Preserving Status Quo* while the parties briefed stay issues. MR8898–99. Peteski and MSM each moved for a stay pending appeal, or else a temporary stay, so the district court could consider requests for a stay pending appeal. MR8996–9004; MR9037–45. The bankruptcy court then entered an *Order Setting Precautionary Due-Process Hearing* ("Due-Process Order"), setting a hearing at which the Court would address "any additional evidence and arguments related solely to" Peteski's stay-motion arguments that the Ruling violated due process by finding "cause" on two of the four grounds—the CRO's testimony alleged lack of candor and Dr. McGraw's alleged intentional deletion of a text. MR9098. Yet the Due-Process Order itself made clear the bankruptcy court believed the alleged deletion of a text was "purposeful," that it "intend[ed] to convert this case to Chapter 7 pursuant to a separate order," and that the court would not consider anything further on the other two cause grounds. MR9096, 9098. And the Due-Process Order listed potential new "causes," many of which had never been raised, argued, or proven by any party. MR9098.

Peteski and Dr. McGraw filed a trial brief before the due-process hearing, as did MSM. MR9228–59; MR9285–311. Petitioners' brief explained, *inter alia*, that (1) due process was not satisfied, at least for the two cause grounds at issue, because Peteski, Dr. McGraw, and MSM were not given meaningful notice and opportunity to be heard pre-Ruling; (2) post-Ruling consideration cannot satisfy due process, especially when the Due-Process Order stated key determinations were not being reconsidered; and (3) the Due-Process Order *added* to the due-process problems by injecting new potential justifications for the earlier Ruling. MR9236–38. The brief explained why each of the four cause grounds is legally and factually unsupportable. MR9239–57.

The bankruptcy court held the hearing on November 13, 2025, starting by reiterating it was not reconsidering certain determinations, and had already "prejudged" to adhere to its decision to

convert the case. MR9353. On November 18, 2025, the court entered both a "Memorandum Decision," in which it provided "Separately Identified Supplemental and Amended Findings and Conclusions," and the Conversion Order. MR9454–85; MR9487–88. Among other things, the Memorandum Decision stated a "more comprehensive fourth cause for conversion" relating to the alleged purposeful deletion of a text message: alleged "bad-faith conduct in the *prosecution* of this bankruptcy case by [Dr.] McGraw, acting for the Debtor." MR9463–65 (emphasis added). The bankruptcy court made this new finding despite, *inter alia*, (1) Trinity and PBR having litigated this case as one alleging *only* a bad-faith bankruptcy *filing*, *see, e.g.*, MR324, 343–44, 349, 351; MR454, 455–56, 458; MR9509, 9511, 9565, 9572, 9574, 9576, 9578; MR2731, 2739–40, 2757–58, 2760, 2762, 2764; MR4457; and (2) the court itself repeatedly explaining during the trial that the bad-faith inquiry was tied to the *filing* date, *see, e.g.*, MR4548; MR8408; MR7965–66. Indeed, the bankruptcy court admitted Peteski and Dr. McGraw had no opportunity to address what it called "the amended Fourth Cause" prior to the Memorandum Decision. MR9467 & n.6. The bankruptcy court also denied Peteski's and MSM's requests for stay relief. MR9485; MR9489.

Peteski and Dr. McGraw noticed their appeals on November 10, 2025 in an abundance of caution, and filed an amended notice of appeal the day the Conversion Order was entered. MR9103–09; MR9498–505. That appeal is proceeding, with a temporary administrative stay in place and requests for a stay pending appeal briefed. Petitioners also file this mandamus petition to ensure their ability to fully challenge the Conversion Order and related rulings, and out of an abundance of caution based on contentions that Petitioners cannot appeal these adverse decisions.

## STANDARD OF REVIEW

Mandamus is an extraordinary remedy, but it is the appropriate avenue for vindicating rights lost through a clear abuse of judicial discretion. *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380 (2004). Courts evaluate mandamus petitions based on three factors, asking whether petitioners

(1) have established a "clear and indisputable right" to issuance of the writ; (2) satisfy the court that "the writ is appropriate under the circumstances;" and (3) have "no other adequate means to attain the relief [they] desire[]." *Id.* at 380–81 (internal quotes and citations omitted).

First, the "clear and indisputable right" factor demands more than a mere showing that the court misinterpreted the law or misapplied facts. *In re Depuy Orthopedics, Inc.*, 870 F.3d 345, 350–51 (5th Cir. 2017). But when a court clearly abused its discretion, the "right to issuance of the writ is necessarily clear and indisputable." *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 311 (5th Cir. 2008). "[A] court's exercise of its discretion is not unbounded; that is, a court must exercise its discretion within the bounds set by relevant statutes and relevant, binding precedents." *Id.* at 310; *see Albemarle Paper Co. v. Moody*, 422 U.S. 405, 416 (1975). "A district court abuses its discretion if it: (1) relies on clearly erroneous factual findings; (2) relies on erroneous conclusions of law; or (3) misapplies the law to the facts." *Volkswagen*, 545 F.3d at 310 (citation omitted). Mandamus is warranted "when such errors produce a patently erroneous result." *Id.*

Second, whether a writ "is appropriate under the circumstances" can be determined as the result of satisfying the other factors, as in *Volkswagen*: after finding a clear abuse of discretion and "that the showing satisfies the other requirements of the Supreme Court for mandamus," the court "conclude[d] that a writ is appropriate under the circumstances of this case." *Id.* at 309; *see also id.* at 319 ("nothing that would render the exercise of our discretion to issue the writ inappropriate"). Mandamus is "particularly appropriate" if a case presents issues "importan[t] beyond the immediate case," providing guidance on legal issues to lower courts. *Id.* at 319.

Third, mandamus is available to parties who lack the ability to obtain relief through the appellate process. *Depuy*, 870 F.3d at 352–53. One area in particular where mandamus provides the sole path for the relief Petitioners seek here is ordering a court to vacate or strike only certain

parts of an order that may have lasting, collateral effects on the reputation or professional endeavors of a person discussed in those portions. *See, e.g.*, *In re Williams*, 156 F.3d 86, 92–93 (1st Cir. 1998); *U.S. Lines Co. v. MacMahon*, 285 F.2d 212, 212 (2d Cir. 1960).

## REASONS FOR GRANTING THE WRIT

This is a paradigmatic example of a lower court far exceeding the bounds set by relevant law, not to mention the record and party arguments before it. *See Volkswagen*, 545 F.3d at 310. The bankruptcy court's rulings are rife with patently erroneous findings and conclusions that disregard or misapply the relevant law and that rely on the court's suspicions to make up for a complete lack of supporting evidence. And the bankruptcy court's repeated raising of new legal theories that no party had advanced, as well as creation of facts (unsupported by any evidence) to buoy the court-raised legal theories, have likewise produced a patently erroneous result that clearly abused the bankruptcy court's discretion in numerous respects. Mandamus is warranted.

## I.    Petitioners have a clear and indisputable right to the writ because the bankruptcy court proceedings were riddled with due-process violations and procedural errors that demonstrate clear abuses of discretion.

Trial courts do not have discretion to violate due-process rights, ignore the requirements and limitations imposed by statutes, or violate procedural rules, yet *all* those things occurred in the bankruptcy proceedings below, as demonstrated in the Ruling, Memorandum Decision, and Due-Process Order, among other places. These errors alone require vacatur and striking all offending portions of the bankruptcy court's various rulings.

Due process requires a meaningful opportunity to be heard *following* adequate notice of the issues the court intends to decide. *E.g.*, *Armstrong v. Manzo*, 380 U.S. 545, 550, 552 (1965). The party-presentment principle also applies and helps police due-process rights by requiring courts to neutrally analyze and rule upon the issues and arguments raised by the parties, rather than offer up new arguments in support of a ruling favoring one party—especially when a court does

so after rejecting the arguments raised by the party obtaining the favorable ruling. *See, e.g.*, *Clark v. Sweeney*, 607 U.S. __, 2025 WL 3260170, at *1–2 (Nov. 24, 2025).

In this case, Trinity and PBR sought relief by arguing primarily that (1) the purported actions of non-debtors led to a bankruptcy *filing* in bad faith and without a valid purpose, and (2) there was no corporate authority for the appointment of independent director Broadbent, nor for him to file the bankruptcy case. *E.g.*, MR341–55; MR456–62. The bankruptcy court explicitly rejected the second argument and implicitly rejected the first, *nowhere* finding the bankruptcy was filed in bad faith or without a valid purpose. *See generally* MR8900–75. Instead, the court's rulings rest mostly on "cause" bases that no litigant had argued (and no evidence had established).

The subsections below will address these clear abuses of discretion in further detail, but at the outset Petitioners note just some of the patently erroneous rulings that demonstrate a clear entitlement to mandamus relief. The bankruptcy court:

- Found "cause" based on at least two, and possibly more, grounds that no party raised, argued, or proved, *see infra* Sections II.A–B;

- Determined *sua sponte* that a text message Dr. McGraw sent to a friend was "property of the estate," and did so within the context of a motion-to-dismiss hearing rather than through an adversary proceeding with proper notice and hearing, *see infra* Sections II.A.1, 3;

- Purported to reopen proceedings to "fix" due-process issues *without* vacating any of the court's earlier findings and conclusions, *see infra* Section II.A.2;

- Added other enumerated bases *sua sponte* to possibly support its previously made decision in its order setting the "due-process" hearing, *see id.*;

- Confirmed at the start of the "due-process" hearing that its mind was already made up as to its factual findings and its conclusion that conversion was proper, *see id.*;

- Repeatedly stated at trial that the bad-faith inquiry is focused on the date of bankruptcy filing, only to later "amend" its decision following the purported "due-process" hearing to find "bad-faith *prosecution*" as a *sua sponte* cause ground, *see id.*; and

- Admitted Petitioners had no opportunity to be heard on this "amended" ground, *see id.*

12

These due-process and party-presentment violations alone undermine the Conversion Order and related rulings. As explained below, based on these grave procedural errors, mandamus is needed to vacate all the orders under review in their entirety, or at least vacate the relevant parts and strike all offending statements and findings related to them.

**II.    Petitioners have a clear and indisputable right to the writ because the bankruptcy court abused its discretion with each of its four purported "cause" grounds.**

    **A.    Ground 4—Dr. McGraw's text message and alleged bad-faith prosecution of the bankruptcy case—is legally flawed, violated important rights, rests on clearly erroneous fact findings, and is otherwise an abuse of discretion.**

In the Ruling, the court held: "The fourth cause for conversion or dismissal: [Dr.] McGraw's destruction of relevant evidence in his capacity as either board member of Merit Street or de facto officer or agent of Merit Street." MR8965. When Peteski explained to the bankruptcy court how that finding was completely untethered from the law and evidence, the court set the "due-process" hearing on this issue—while still prejudging the issue by stating in the Due-Process Order that Dr. McGraw "purposeful[ly]" deleted the text message. MR9098. Then the court, apparently recognizing the Ruling's vulnerability on ground 4, amended it in the Memorandum Decision—yet did so by doubling-down on its erroneous findings and adding yet another layer of due-process violations by issuing an amended ground 4 that even the court admitted the parties had *no* opportunity to address. The Memorandum Decision states that "[t]he [amended] Fourth cause is simply [Dr.] McGraw's bad-faith conduct in the *prosecution* of this [bankruptcy] case . . ." with the only "bad-faith conduct" identified in the court's erroneous finding being Dr. McGraw's alleged "deletion of the text." MR9465 (emphasis added). The amended ground 4 suffers from all the same flaws as the Ruling's ground 4, as it also rests on the clearly erroneous finding that Dr. McGraw purposefully deleted a personal text without *any* supporting evidence and with unrebutted

13

contrary evidence, including that Peteski produced the supposedly missing text (as detailed below), while adding more legal problems that make this ground untenable.

Such patent, harmful errors warrant mandamus relief. The Court should vacate the Conversion Order, Ruling, Memorandum Decision, and Due-Process Order, and it should take the additional step of striking (or ordering the bankruptcy court to strike) all findings and conclusions related to ground 4 (originally or as amended) from any of these orders and elsewhere.

1. ***No legal authority supports alleged deletion of a text message as a cause ground under the Bankruptcy Code, whether as bad-faith prosecution or otherwise.***

The bankruptcy court never cited any legal authority supporting its determination that the deletion of a text message is "cause" for conversion or other relief under the Bankruptcy Code, either as bad-faith prosecution of the bankruptcy case, as a standalone basis, or otherwise. Nor did any Trinity or PBR pleading request conversion or other such relief as a consequence related to the text-message discovery dispute. The Bankruptcy Code simply does not recognize the alleged deletion from a personal phone of a personal text to a friend by a debtor officer as a cause ground, and neither the Ruling nor the Memorandum Decision provides contrary legal support. Even if the evidence supported a finding of intentional deletion (and it does not, *see infra*), the bankruptcy court's reliance on deletion of a text message to support its order to convert to Chapter 7—or any other relief—is a clear venture beyond "the bounds set by relevant statutes and relevant, binding precedents" and is thus abuse of discretion by the court. *See Volkswagen*, 545 F.3d at 310.

In terms of statutorily "enumerated" cause grounds, the Ruling did not even try to link its ground 4 findings to any enumerated ground under Section 1112(b), which governs conversion to Chapter 7—much less Section 1104(a), which applies *solely* for Chapter 11 trustee appointment, contrary to the bankruptcy court's confusing reliance on Section 1104 when ordering conversion. *See* MR9463. Further, after having *sua sponte* offered up myriad possible enumerated grounds to

14

consider at the "due-process" hearing, MR9098, the Memorandum Decision relied in conclusory fashion on only one possible conversion basis for amended ground 4—gross mismanagement of the estate (Section 1112(b)(4)(B)). Yet that enumerated ground is unsupported legally or factually here. *See* MR9242–47. It relies on estate property being at issue, but as explained below, there is no evidence or authority supporting the notion that the text at issue was property of the estate, nor was an adversary proceeding held to make that determination. *See* Fed. R. Bankr. P. 7001(b); *see also In re Zale Corp.*, 62 F.3d 746, 762 (5th Cir. 1995). The court's cursory comment belies any suggestion that it conducted the proper analysis or made the requisite findings for a determination of debtor's property, *see In re Zale*, 62 F.3d at 765, thus failing to satisfy due process and the bankruptcy rules. *Cf. In re CTLI, Inc.*, 528 B.R. 359, 366–67 (Bankr. S.D. Tex. 2015) (demonstrating the analysis and findings required). So the bankruptcy court's reliance on cases in which an adversary proceeding *was* conducted (*In re Advanced Modular Power Sys., Inc.*, 413 B.R. 643, 670 (Bankr. S.D. Tex. 2009), *aff'd sub nom. Hsu v. West*, 2009 WL 7760300 (S.D. Tex. Dec. 30, 2009)), or a motion for contempt and sanctions *was* ruled upon (*In re Correra*, 589 B.R. 76, 132 (Bankr. N.D. Tex. 2018)), is misplaced. That is especially true because the court's *sua sponte* finding was made in a motion-to-dismiss hearing where no relevant evidence was presented or considered on the classification of estate property. Regardless, no evidence presented supports a finding that anything to do with the text message constituted gross mismanagement of the estate.

Equally unsupported, both legally and factually, is any attempt to anchor the text-message-related finding in the "dishonesty" ground found only in Section 1104(a)—which, again, cannot support *conversion* in any event. *See* MR9247–49. The bankruptcy court cited no legal authority that perceived dishonesty related to *discovery* matters is the type of conduct contemplated by Section 1104(a), and here the missing text was produced. Moreover, Trinity and PBR had the

burden to show dishonesty by clear and convincing evidence, but they solicited no such testimony and presented no such evidence. *See In re Ford Steel, LLC*, 629 B.R. 871, 889 (Bankr. S.D. Tex. 2021). And even if the court could discredit Dr. McGraw's testimony that he did not delete the text, that does not supply *affirmative* evidence of deletion, much less intentional deletion, to show Dr. McGraw was dishonest. *See Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984) (disbelieved testimony may be disregarded, but "[n]ormally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion"). Nothing supports applying the Section 1104(a) "dishonesty" ground in this context and on this record. There is no authority (or evidence) supporting ground 4 as an enumerated "cause" under Sections 1112(b) or 1104(a).

As for "unenumerated" grounds under Sections 1112(b) or 1104(a), as noted above, the only such ground raised by Trinity and PBR was bad-faith *filing*, which the bankruptcy court implicitly rejected by failing to find bad-faith filing in the Ruling or the Memorandum Decision. Moreover, neither Trinity nor PBR ever claimed the alleged deletion of a text constituted independent, unenumerated cause under either Sections 1112(b) or 1104(a), and they certainly did not present as cause grounds the bankruptcy court's newfound "bad-faith prosecution" idea. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020). The bankruptcy court cited nothing to support its belated, amended ground 4. Allowing a bankruptcy court to justify conversion (or other relief) on the fly with such a nebulous, roving grant of unenumerated authority, leaving parties to learn the potential grounds only when a decision is announced (an amended decision, no less), would require any debtor facing conversion or other requested relief to divine infinite possible, unenumerated grounds and then fight against and rebut them before any movant has asserted them. This defies common sense and settled law, including due process—as explained further below. But regardless, it is legally incorrect and cannot stand under the Bankruptcy Code.

In sum, resting "cause" under the Bankruptcy Code on the alleged deletion of a text message, however it is dressed up, is clear legal error that justifies mandamus relief.

2.    ***The bankruptcy court's due-process violations and other procedural errors, in findings related to a supposedly deleted text message, warrant mandamus relief.***

Due process demands meaningful notice and an opportunity to be heard. *Armstrong*, 380 U.S. at 550, 552; *see In re Tribune Media Co.*, 2019 WL 643734, at *4 (D. Del. Feb. 15, 2019). And under the party-presentation principle, reversal is warranted when a court grants relief on a claim never asserted by a party. *E.g.*, *Clark*, 2025 WL 3260170, at *1–2. This principle prevents courts from roving the cases before them, "looking for wrongs to right." *Sineneng-Smith*, 590 U.S. at 376 (citation omitted). Instead, a court serves as "neutral arbiter of matters the parties present." *Id.* at 375 (citation omitted).

But here, Trinity and PBR *never* advanced a cause ground of bad-faith *prosecution* of the bankruptcy proceeding, nor did they ever ask for conversion or other such Bankruptcy Code relief based on the alleged deletion of a text message. Not until the bankruptcy court *sua sponte* made the alleged deletion into cause ground 4 in the Ruling did Petitioners have notice of that possibility, and not until the bankruptcy court *sua sponte* made bad-faith prosecution the amended cause ground 4 in the Memorandum Decision did Petitioners have notice of *that* possibility. Petitioners thus had no meaningful notice of, or opportunity to be heard on, this cause ground as originally announced or as amended. *See In re Tribune*, 2019 WL 643734, at *4. And nothing about the unusual, admittedly prejudged "due-process" hearing cured anything. These repeated due-process and party-presentment violations support mandamus relief as to all versions of cause ground 4.

a.    Amended ground 4 violates due process and is legally erroneous because no party alleged bad faith in the *prosecution* of the bankruptcy and the court repeatedly stated the bad-faith inquiry related to the "petition date."

Cause ground 4 as amended, resting on alleged bad-faith *prosecution* in the bankruptcy case because of alleged deletion of a text message, plainly violates due process and the party-presentment principle. The bankruptcy court *sua sponte* invented it in the Memorandum Decision, even admitting there that no party had *any* chance to confront this new, amended ground before then and would simply have to address it on appeal. MR9467 n.6.

First, there is no way to reconcile amended ground 4 with Petitioners' due-process rights. Petitioners never had notice, much less an opportunity to be heard, on this court-created theory.

Second, amended ground 4 certainly violates the party-presentment principle. While a bankruptcy court may act *sua sponte* to enforce or implement orders, or prevent abuse of process, this does not give it license to act as "a roving commission to do equity." *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986); *see also In re Mirant Corp.*, 378 F.3d 511, 523 (5th Cir. 2004). As the Supreme Court recently confirmed, "[t]o put it plainly, courts 'call balls and strikes'; they don't get a turn at bat." *Clark*, 2025 WL 3260170, at *1 (citation omitted). But here, instead of being a neutral umpire, the bankruptcy court served as clean-up hitter.

In *Clark*, the Fourth Circuit had overturned a jury conviction based on a "combination of extraordinary failures from juror to judge to attorney," even though the appellant's sole claim in his habeas petition was ineffective counsel for failure to *voir dire* the entire jury panel after a juror was dismissed for misconduct. *Id.* at *2. The Supreme Court reversed, explaining the Fourth Circuit "radical[ly] transform[ed]" the claim presented and thereby "transgressed the party-presentation principle by granting relief on a claim that [the appellant] never asserted and that the State never had the chance to address." *Id.* Likewise in *Sineneng-Smith*, the Supreme Court reversed a holding that the statute underlying the appellant's conviction was *overbroad*, when the

18

appellant had argued only that it was unconstitutionally *vague*. 590 U.S. at 377–79. While the court of appeals gave the parties a chance to file supplemental briefs on the court-raised overbreadth issue, the Supreme Court held that "[n]o extraordinary circumstances justified the panel's takeover of the appeal," remanding "for reconsideration shorn of the overbreadth inquiry interjected by the appellate panel and bearing a fair resemblance to the case shaped by the parties." *Id.* at 379–80.

The bankruptcy court here performed the same "radical transformation" of Trinity's and PBR's case. They alleged throughout that bad faith occurred *at the time of filing the bankruptcy petition* in July 2025. *See, e.g.*, MR324 ("As will be set forth herein, this Chapter 11 Case was transparently *filed* in bad faith . . . which cannot be rectified." (emphasis added)), 343 ("Trinity submits that cause exists to dismiss or convert the case for lack of good faith *filing*." (emphasis added)); *see also* MR344, 349, 351; MR454 ("PBR joins with [Trinity] in the argument that Merit Street Media, Inc.'s chapter 11 bankruptcy case was *filed* in bad faith and does not serve a valid bankruptcy purpose." (defining terms omitted) (emphasis added)); 455–56 ("[T]he Debtor *filed* this case in bad faith." (emphasis added)); *see also* MR456, 458. And they each maintained this in their September 15, 2025 briefs, *after* Peteski's production on August 26, 2025 of the text messages allegedly indicating a missing text message from a prior production, and *after* Trinity and PBR raised concerns of a missing text message at a hearing. *See, e.g.*, MR9509; *see also* MR9511, 9565, 9572, 9574–76, 9578; MR2731 ("Dr. Phil *filed* the case in bad faith. It should be converted to Chapter 7." (emphasis added)); *see also* MR2739–40, 2757–58, 2760, 2762, 2764.

In short, Trinity and PBR consistently argued bad-faith *filing* both before and at the motion-to-dismiss hearing. There was no hint of bad-faith *prosecution* alleged in merits briefing submitted before the hearing, or even of seeking conversion or other relief under the Bankruptcy Code based on the alleged deletion of a text. The bankruptcy court cited Trinity's reference to the supposed

19

deletion of a text in a timeline on a slide in Trinity's opening-statement demonstrative. MR9464. But that did not give remotely sufficient notice that Trinity (or PBR) was adding a new "cause" ground of bad faith in *prosecution* of the bankruptcy. To the contrary, in that presentation, Trinity's counsel confirmed its argument was limited to bad faith at the time of filing:

> [T]he pleading seeks three different forms but related forms of relief, the conversion of the case to Chapter 7, the dismissal of the case from Chapter 11, or the appointment of a Chapter 11 trustee. . . . Did the debtor have the requisite corporate authority, or did the debtor file a case without the requisite corporate authority? And, did they *file it* in bad faith?

MR4457 (emphasis added). No party argued for what the bankruptcy court did in the Memorandum Decision. The court *sua sponte* made it up—yet another troubling example.

The party-presentment principle serves to prevent just this sort of court-injected argument to supplement or replace the argument of the parties. *See Clark*, 2025 WL 3260170, at *1; *Sineneng-Smith*, 590 U.S. at 375. And Petitioners were certainly not given proper notice or due process to meaningfully respond to such an accusation.

This conclusion is all the more clear because the bankruptcy court itself stated throughout trial that the bad-faith allegation related to the "petition date," limiting the trial focus to the time of filing. For example, after Trinity objected to opening arguments by Peteski and Debtor as improperly discussing post-filing conduct—such as the Chapter 11 Plan supported by the Official Committee of Unsecured Creditors and others—the bankruptcy court agreed with Trinity: "I do think that the good faith issue is most relevant *on the petition date*." MR4548 (emphasis added). And later, Trinity and the court rooted the focus in the "bankruptcy petition" filing:

> Trinity counsel: Your Honor, I'm going to renew my objection [to Peteski's counsel's direct examination of Dr. McGraw]. [Dr.] McGraw's feelings about good faith or not are not relevant. The issue is whether or not *the debtor filed* this motion in good or bad faith.
>
> THE COURT: *The bankruptcy petition? The bankruptcy petition?*

20

Trinity counsel: Yes, sir.

MR8408 (emphasis added).

Further, on the final day of evidence, Trinity's counsel again raised relevancy objections during Peteski's direct examination of Dr. McGraw, prompting this exchange:

> Peteski counsel: . . . So if the Court's view is that we are limited only to prebankruptcy activity, then the question I was about to ask is probably –
>
> The Court: I'm not saying that—I'm not saying that the issues are solely related to the prebankruptcy activity. They're making the argument that the—*as far as the bad faith argument, the intent is at the time of the bankruptcy filing. That's the position, I think, of the parties.*
>
> Peteski counsel: Okay.
>
> The Court: They also argue that some of the things that happened after bankruptcy may or may not inform the debtor's intent *on the day of the filing*. So at least—I did say at one point that, *at least on the bad faith argument, the relevant time period appears to be the petition date*. That doesn't mean that the evidence either before or after the petition date may not be relevant to *that*.

MR7965–66 (emphasis added). The court thus precluded Peteski's evidence and argument on the basis that it was considering good or bad faith at the time of the filing. But the Memorandum Decision, like the Ruling, makes no findings of bad faith *at the time of filing*, instead holding that the supposed deletion of a text message evidenced bad faith "in the prosecution of this bankruptcy case." MR9465.

The bankruptcy court's reliance on a theory it disallowed evidentiary development of during the hearing, and its decision to base "cause" on an amended ground 4 that no party raised or argued, is a clear violation of the party-presentment principle and Petitioners' due process rights. *See, e.g.*, *Clark*, 2025 WL 3260170, at *1; *Sineneng-Smith*, 590 U.S. at 375–76.

      b.      <u>The bankruptcy court's post-Ruling actions exacerbated, rather than cured,</u>
<u>the due-process violations and errors in the Ruling and Due-Process Order.</u>

Beyond the above due-process and other procedural errors in the Memorandum Decision alone, the Ruling's original ground 4 was procedurally infirm and violated due process, and the court's post-Ruling actions and decisions only caused more due-process problems and legal error.

First, the original cause ground 4 plainly violated due process and the party-presentment principle because no party raised the alleged deletion of a text message as a possible "cause" ground, such that the first time it was raised was by the bankruptcy court *sua sponte* in the Ruling. Petitioners had no notice or meaningful opportunity to be heard on it before the Ruling. *See, e.g.*, *Armstrong*, 380 U.S. at 550, 552. And it was a stark violation of the party-presentment principle. *See, e.g.*, *Clark*, 2025 WL 3260170, at *1–2; *Sineng-Smith*, 590 U.S. at 375–76. That is surely why the bankruptcy court chose to hold a "due-process" hearing.

Second, notwithstanding the "due-process" hearing, the law is clear that the lack of due process in the Ruling cannot be fixed by a limited reopening of proceedings *after* announcing the Ruling. When due-process rights are violated, the court must "wipe[] the slate clean" and "restore[] the petitioner to the position he would have occupied had due process of law been accorded to him in the first place." *Armstrong*, 380 U.S. at 552. The Supreme Court has squarely held that a lack of due process cannot be cured through additional arguments and evidence. *See id.* at 548–49, 552.

Third, the Supreme Court has flatly rejected the notion that violations of the party-presentment rule can be cured by allowing later briefing on the unalleged issue. *See Sineng-Smith*, 590 U.S. at 378–80.

Fourth, even if after-the-fact briefings *could* resolve due-process violations, the court failed to do so here with unusual process and prejudged outcome. Though the court set a "due-process" hearing, it did not vacate the Ruling or set aside its findings or conclusions that Dr. McGraw

intentionally deleted a text message. Quite the opposite. In the Due-Process Order, the court made clear its already-set view that Dr. McGraw had "purposeful[ly] delet[ed]" a text message. MR9808. Further, it started the "due-process" hearing by stating it already had its mind made up and would not reconsider its findings that Dr. McGraw "purposeful[ly] delet[ed]" a text or that conversion to Chapter 7 was proper. *See* MR9098; MR9353, 9355; MR9473; *see also Cont'l Box Co. v. N.L.R.B.*, 113 F.2d 93, 95–96 (5th Cir. 1940).

Importantly, *nowhere* in the Due-Process Order did the bankruptcy court inform anyone it was considering a new alternative finding of unalleged bad-faith *prosecution*. That omission is glaring because the court *sua sponte* raised in the Due-Process Order a host of new, court-proposed potential cause grounds not raised by the parties—offering Trinity and PBR yet more judicial help to support a prior ruling—including multiple enumerated grounds and a nebulous reference to "unenumerated" grounds. *See* MR9097–98. Likewise, at the "due-process" hearing, the court gave no indication it was considering a different, unalleged, unenumerated ground based on bad-faith *prosecution*. Again, the Memorandum Decision admits Petitioners never had *any* opportunity to be heard on this new "amended" ground 4. MR9467 n.6. The Ruling's ground 4 based on Dr. McGraw's alleged deletion of a text was plainly improper as a legal matter and violated Petitioners' rights. The court's subsequent actions—holding only a limited, post-decision opportunity to address certain issues while admitting the outcome is prejudged, and then springing another new, judge-made ground *sua sponte*—severely compounded those errors while adding new and independent due-process violations and other legal errors.

*    *    *

The bankruptcy court's cause ground 4, originally and as amended, is patently erroneous simply from these grave due-process and other procedural defects.

23

**3.**    ***Ground 4, originally and as amended, also rests on clearly erroneous factual findings and is legally flawed for other reasons.***

In addition to the plain legal errors and due-process and other procedural violations in the bankruptcy court's original and amended ground four, the evidentiary record does not support the bankruptcy court's factual findings on alleged purposeful deletion of a text message by Dr. McGraw. Thus, the holding is triply in error and ripe for mandamus and reversal.

**a.**    <u>No evidence supports a finding of "purposeful deletion."</u>

There is *no* evidence that Dr. McGraw or anyone else intentionally deleted a text message. The only evidence on the supposedly missing text is: (1) a thread between Dr. McGraw and his friend, Jamie Ribman, that does not contain the at-issue text, MR6535–37; (2) a text between Dr. McGraw and Phil McIntyre wherein Dr. McGraw states, "What I sent to [Mr. Ribman]," followed by what the bankruptcy court believed is a copy/paste of the allegedly missing message, MR5212–13; MR8939; and (3) Dr. McGraw's consistent testimony that he did *not* delete the text:

> THE COURT: The missing text to Mr. Ribman, did you delete it because it was unflattering and you didn't want people to see it?
>
> THE WITNESS [Dr. McGraw]: I can—having spent a lot of time in court, I understand being under oath, and I can tell you unequivocally I did not delete that text message for any reason whatsoever.
>
> THE COURT: No explanation why just that one was missing?
>
> THE WITNESS: I absolutely don't, and we have made gargantuan efforts to try and find out why it is not there and where it is. We've had it—I think four or five times, we have had the phone scanned and worked on.
>
> THE COURT: That is all I have.

MR8122–23. The court did not inquire further or give any party an indication it was expecting additional presentation on this discovery issue at the trial.

To support the Ruling's contrary finding, the court stated: "Neither Peteski nor the Debtor nor anybody else ever provided a satisfactory explanation of the missing text, and [Dr.] McGraw's

testimony at trial professing not to know what happened to the missing text was not credible." MR8935–36. But "[n]either Peteski nor the Debtor nor anybody else" knew the court was *sua sponte* considering the missing text as an independent "cause" ground for conversion or other relief, so they did not know the trial—where the court limited discussion of other motions (like a separate sanctions motion related to discovery) or of post-filing good faith—was the time to argue and present additional evidence related to the missing message. MR8122–23.

More importantly, even if the bankruptcy court did not find Dr. McGraw's testimony regarding the missing text credible, that does not *affirmatively* establish evidence of deletion, much less intentional deletion. *See Bose Corp.*, 466 U.S. at 512 ("When the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion."). The bankruptcy court's finding that Dr. McGraw's limited testimony on this issue was not credible does not amount to affirmative evidence contrary to his testimony. And there is *no affirmative evidence* showing purposeful deletion of the text message. The dearth of supporting evidence renders the bankruptcy court's findings of an intentional deletion of the text clearly erroneous and an abuse of discretion, in the Ruling, the Memorandum Decision, and elsewhere.

This conclusion—and vacating or striking this holding—is especially justified because Trinity and PBR would have had the burden of proof on this issue if it *had* properly been raised to the bankruptcy court. In such a scenario, this would have amounted to a spoliation request, which would have made it *Trinity and PBR's* burden to prove intentional deletion *and* cause, not Petitioners' burden to disprove an unalleged cause ground. *See Parker v. Bill Melton Trucking, Inc.*, 2017 WL 726909, at *3 n.3 (N.D. Tex. Feb. 24, 2017); *see also Miller v. Dunn*, 774 F. Supp. 3d 806, 818–19 (N.D. Tex. 2024). Finding cause based on a determination that Dr. McGraw

purposefully deleted a text belonging to the estate because of a *lack* of evidence that he did *not* is plainly improper. *See Miller*, 774 F. Supp. 3d at 819; *Parker*, 2017 WL 726909, at *3 n.3. At most, the record indicates that a text is missing from the McGraw–Ribman thread, and that it was produced elsewhere. This is insufficient to carry Trinity and PBR's evidentiary burden, especially because Petitioners were unaware of the text's unannounced relevance to the motion-to-dismiss hearing. Mandamus relief is warranted.

> b.   <u>Peteski undisputedly produced the text message.</u>

The bankruptcy court's findings on ground 4 are especially misplaced because the allegedly "missing" text *was produced by Peteski before trial*. *See* MR8939; MR5212–13. Trinity and PBR discussed the substance of the text at the hearing and in briefing. *See, e.g.*, MR7650–51, 7695–7704. In fact, the Ruling noted that the substance of "the deleted text was raised prominently in the reply briefs of both Trinity and PBR" filed before trial. MR8966. The content of a text cannot be simultaneously missing and "raised prominently." There was undisputedly no harm or prejudice from the "missing" text.

If anything, the fact that the identical message existed elsewhere and was produced *by Peteski* disproves the allegation that Dr. McGraw intentionally deleted the original message. But it certainly provides no justification for the bankruptcy court to speculate—and there was *no* evidence supporting the court's finding—that Dr. McGraw "apparently forgot to delete the copy." MR9473. That is complete conjecture by the court, unsupported by any evidence, that should be stricken while this entire ground 4 (originally and as amended) is vacated and stricken from all rulings below.

> c.   <u>No evidence supports a finding that the text was property of a debtor estate.</u>

There is also no evidence the text was "property of the estate," which was critical to the Ruling's linking this as cause ground. MR8937, 8965–66; MR9466.

Substantively, there is no evidence that a personal text on a personal phone could constitute estate property. That is especially true where there is no evidence the recipient Mr. Jamie Ribman was an agent of a creditor—as distinct from his wife Mrs. Darcy Ribman, who is a creditor representative. *See also* MR9077–81.

Procedurally, too, it was legal error for the bankruptcy court to determine what constitutes "property of the estate" in this way because that is a fact-intensive analysis that typically requires an adversary proceeding. *See* Fed. R. Bankr. P. 7001(b); *see also In re Zale*, 62 F.3d at 762–65. But here, *no party* requested any determination of whether Dr. McGraw's texts were property of the estate. *Cf. In re Zale*, 62 F.3d at 765. The bankruptcy court's *sua sponte* decision to include the determination of debtor estate property in a motion-to-dismiss ruling "does not satisfy the procedural rules required by Rule 7001." *Id.* at 763. And the Memorandum Decision doubles-down on this clearly erroneous and legally unsupportable finding, despite perfunctorily stating the outcome would be the same without it. *E.g.*, MR9465–66 & n.5.

The few cases the Ruling cites for Dr. McGraw's personal texts being part of the Debtor's estate are unavailing and inapplicable to the record here. *See* MR8937–38. The court in *In re CTLI* found that a debtor's *business* social media accounts were "property of the estate," but noted that "[t]he characterization of *individual*—as opposed to business—social media accounts as property is much more difficult" and held that "the property interest in an individual Profile would likely not become property of the estate." 528 B.R. at 366–67. If anything, *In re CTLI* supports a finding that Dr. McGraw's *personal* text messages are *not* property of the estate.

Similarly, the cited opinion of *In re Advanced Modular Power Systems, Inc.* involved an *adversary proceeding* where a Chapter 7 trustee brought claims related to turnover of debtor's property and a *request for sanctions* related to the same; the court awarded sanctions and held the

debtor's estate "include [debtor]'s intangible assets . . . associated with the operation of its business." 413 B.R. at 654, 662, 670. Here, there has been no proceeding or evidence presented on whether Dr. McGraw's personal text messages were used in operation of MSM's business. Likewise, *In re Correra* involves a *motion for contempt and sanctions* and a holding that a physical computer should have been turned over to the trustee "based on the abundant direct evidence" presented on this issue, which is inapplicable to the finding here on a *motion-to-dismiss hearing* where *no evidence* was presented by either party on the issue. 589 B.R. at 132. And the determination in *Torch Liquidating Trust ex rel. Bridge Associates L.L.C. v. Stockstill* of whether "a cause of action for breach of fiduciary duty owed to the corporation that is property of the corporation at commencement of the chapter 11 case becomes property of the debtor's estate" is not relevant to the assessment of Dr. McGraw's personal text messages. 561 F.3d 377, 386 (5th Cir. 2009). Critically, none of these cases determine the scope of a debtor's estate in the context of finding "cause" to dismiss or convert a case to Chapter 7.

Moreover, each opinion cited by the bankruptcy court only emphasizes the importance of requiring ample evidence and opportunity for the parties to present evidence directly on this issue. Such a record simply does not exist here. The only evidence presented regarding the "missing" text message is Dr. McGraw's testimony that he did not delete it and certainly did not do so intentionally, and the fact that he never sent it to any creditor connected to the bankruptcy case. MR5212–13; MR8939; MR8122–23. The finding that Mr. Ribman was acting as a creditor trust's agent lacks any evidence, violates the party-presentment principle, and improperly blames *the trust* for "never speaking up to set the record straight," despite PBR and Trinity bearing the burden of proof. *See* MR9462; MR9079–81. None of this can stand.

At bottom, there is no evidence to support "property of the estate" and "no indication in the record that the bankruptcy court conducted the proper analysis and made the requisite findings for" determination of debtor's property. *See In re Zale*, 62 F.3d at 765 (citing Rule 7001); *cf. In re CTLI*, 528 B.R. at 366–67. This is clear grounds for mandamus and reversal.

        d.     <u>Ground 4, to the extent it is a sanction, is legally and factually improper.</u>

The bankruptcy court backtracked on its Ruling after Peteski pointed out that the ground 4 holding was an unlawful sanction, *see* MR9474, but the fact remains that "cause" ground 4— originally and as amended—*still* functions as a sanction. Indeed, the Ruling cited opinions issued on motions for sanctions in support of its holding. *See* MR8938.

Yet no litigant requested conversion as a sanction for the alleged deletion of a single text message—not even in the still-pending motion for contempt and sanctions. *See* MR1378–79; MR1748–62; MR2182–97; MR1407; MR3196–216. That alone makes the findings on this ground improper, as a matter of due process and procedure.

Moreover, the Conversion Order is also substantively improper as a sanction for myriad reasons, including because the supposedly missing text *was produced*. Federal Rule of Civil Procedure 37(e) limits sanctions to situations where lost information "cannot be restored or replaced through additional discovery." *See* Fed. R. Civ. P. 37(e); *see also Peals v. QuikTrip Corp.*, 2021 WL 2043185, at *5 (E.D. Tex. May 21, 2021). Here, the allegedly missing text was produced elsewhere: the copy/paste of the message into the text thread between Dr. McGraw and Mr. McIntrye. *See* MR8939; *see also* MR5212–13. As the bankruptcy court admitted, the content of the allegedly missing text message was featured "prominently" in Trinity's and PBR's briefing. *See* MR8966. Because the "missing" message was not missing, no sanction is permitted under Federal Rule of Civil Procedure 37. *See also* MR1443–60; MR3025–34.

Additionally, there is plainly insufficient evidence to issue a sanction. If this ground represents a sanction, Trinity and PBR had the burden of proof to show spoliation of evidence in bad faith. *See Parker*, 2017 WL 726909, at *3 n.3. If the court were to have issued this sanction separate and apart from the Motion for Contempt and Sanctions via its inherent power, the law required a "finding of bad faith . . . supported by clear and convincing proof." *Miller*, 774 F. Supp. 3d at 819 (citation omitted). Regardless of which evidentiary standard applies, the complete *lack* of evidence of intentional, bad-faith spoliation of evidence prohibits any sanction. Any implicit sanction on Peteski or Dr. McGraw pertaining to the missing text message is a violation of due process and contrary to both the record and the law.

### 4.    *All statements and findings relating to ground 4 should be stricken or vacated.*

For all the reasons explained above, cause ground 4 (both as in the Ruling and as in the Memorandum Decision) cannot stand. And for the very same reasons, all statements and findings provided by the bankruptcy court in support of its erroneous determination on this ground should be stricken or expunged from the public record. *See, e.g.*, *In re Williams*, 156 F.3d 86, 92 (1st Cir. 1998) (mandamus is available to "request that offending commentary be expunged from the . . . public record," such as "critical comments made in the course of a trial court's . . . factfinding or opinion writing") (citing 28 U.S.C. § 1651)); *Gardiner v. A.H. Robins Co.*, 747 F.2d 1180, 1188 n.11, 1190–94 (8th Cir. 1984) (striking from court record unjustified comments condemning corporate officers); *cf. Fromson v. Citiplate, Inc.*, 886 F.2d 1300, 1304 (Fed. Cir. 1989) (mandamus proper to strike derogatory comments from court's opinion, but interpreting Second Circuit law as implicitly permitting an appeal). The bankruptcy court's disparaging comments made to prop up its erroneous decision on cause ground 4 are just the sort of "unwarranted judicial excesses" justifying not only reversal but also striking comments from the public record through mandamus. *In re Williams*, 156 F.3d at 93; *see also infra* Part IV.

5.    *This requested relief can and should be granted regardless of the Court's determination on the other issues.*

The harms to Petitioners by the bankruptcy court's ground 4 (originally or as amended), and related comments made in various orders and rulings, warrant mandamus relief independent of any other aspect of this Court's ultimate decision, and even if any other cause ground survives review in this proceeding or in the other appeals. *See also infra* Part IV. Dr. McGraw was not a party in the bankruptcy case, making it particularly improper for the bankruptcy court to *sua sponte* focus a "cause" determination on his post-petition actions when he (and Peteski) had no prior warning about this specific possibility, nor any ability post-Ruling to meaningfully challenge the text-message determination. The court itself recognized it offered no opportunity to "address . . . the amended Fourth Cause," MR9467 n.6, which is especially true for Dr. McGraw. And the court's assurance that it could let this slide because "Peteski will have a full opportunity to address it on appeal" is not only improper, because trial courts should not so freely circumvent due-process and party-presentment principles, it's also no guarantee because Trinity and PBR assert that Petitioners have no appellate rights. *See infra* Part IV. Dr. McGraw and Peteski have an independent right to obtain relief as to cause ground 4, regardless of any other grounds.

If Dr. McGraw especially, but also Peteski, is afforded *no* opportunity to challenge and erase the court's *sua sponte* cause ground 4—whether or not the appellate court ultimately upholds other cause grounds—then the due-process and other violations baked into this "cause" determination will go unremedied and stand as precedent for future courts, insulating from review impactful decisions with serious collateral consequences. The Court should not permit that troubling result. And it need not do so, regardless of its view on the remaining issues in this mandamus. Court opinions that make statements or findings against individuals that can have lingering professional or reputational consequences can be reviewed and remedied, even if the

case would otherwise be moot or evade review. *See, e.g., Pulphus v. Ayers*, 909 F.3d 1148, 1153 (D.C. Cir. 2018) (reputational harm caused by a court's decision "may constitute an ongoing, redressable injury" if court makes comments that are "inherently stigmatizing"); *see also Dailey v. Vought Aircraft Co.*, 141 F.3d 224, 227–28 (5th Cir. 1998) ("collateral consequences" from court order may persist such that "the violation in question may cause continuing harm" and mandamus may be pursued as an avenue of "preventing such harm"). Ground 4 easily fits that category, warranting review and vacatur here regardless of how the Court resolves the remaining issues presented. *See also infra* Part IV.

### B. Ground 3—the chief restructuring officer's alleged candor—is legally flawed, violated important rights, and rests on clearly erroneous fact findings.

As explained above, Debtor MSM appointed Broadbent as an independent director to serve as the CRO, and in that capacity he determined to file for Chapter 11 protection. The bankruptcy court, however, found that the CRO lacked candor in part of his trial testimony and held that this judicial determination constituted an independent cause for conversion or other relief. MR8964. That represents another abuse of discretion. Not only was this ground not raised by the parties, it cannot and does not satisfy any cause basis, and there is no evidence the CRO lacked candor.

First, this ground was raised *sua sponte* by the court, violating due process and the party-presentment principle. *See supra* Section II.A.2. And the bankruptcy court's after-the-fact, limited, and prejudged "due-process" hearing did nothing to cure those violations. *See* MR9470–73.

Second, this ground is legally invalid. An asserted violation of the duty of candor, standing alone, does not meet the Bankruptcy Code's cause standards to support the relief here. *See, e.g., In re V Cos.*, 274 B.R. 721, 725–26 (Bankr. N.D. Ohio 2002) (defining cause grounds). There is nothing in Section 1112(b)(4) authorizing conversion based on lack of candor, nor does such a freestanding basis for cause remotely align with the grounds listed in Section 1112(b)(4), in kind

or character. *See, e.g.*, *id.* While the Memorandum Decision cites the "dishonesty" ground in Section 1104(a), that is legally misguided in the context of converting to Chapter 7 because, as a matter of law, Section 1104(a) is limited to Chapter 11 trustee appointment. The court's reliance on Section 1104(a)—the only ground cited, yet not until the post-Ruling decision after an admitted-prejudged "due-process" hearing—is independent legal error warranting mandamus relief.

The bankruptcy court claimed to rely on its authority under 11 U.S.C. § 105(a), MR8964–65, but that is another patently erroneous application of the law. Procedurally, when a court acts pursuant to Section 105(a) authority, "the concept of procedural due process requires a notice and an opportunity to be heard." *In re Tennant*, 318 B.R. 860, 870 (B.A.P. 9th Cir. 2004). Here, though, the court failed to provide meaningful opportunity about the CRO's candor as an independent justification for conversion. More importantly, Section 105(a) provides no standalone basis for cause. Section 105(a) powers "are not unlimited" and do "not permit . . . courts to 'act as roving commission[s] to do equity.'" *In re Mirant*, 378 F.3d at 523 (second alteration in original) (citation omitted). It is a basic principle of bankruptcy law that a court generally may not award relief under Section 105(a) "if cause does not exist to do so under section 1112(b)." 7 Collier on Bankruptcy, ¶ 1112.04 (16th ed. 2018). Section 105(a) thus adds nothing: because the CRO's testimony cannot provide cause under Section 1112(b) (or Section 1104(a)), it follows that the bankruptcy court lacked discretion to invoke Section 105(a) to *sua sponte* convert this case (or provide other relief) based on the same testimony. Section 105(a) cannot act as a workaround to "contraven[e]" Section 1112(b) and supply independent authority to convert or award other relief. *Id.*; *see also In re Mirant*, 378 F.3d at 523; *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003). The court's misapplication of Section 105(a) therefore not only violated due process but

was a legally improper application of the statute. The result is patently erroneous and a clear abuse of discretion.

Neither Trinity nor PBR established cause under the Bankruptcy Code for this ground (unsurprisingly, as they never asserted it). And granting conversion or other relief based on a fiduciary's testimony allegedly lacking candor exceeds the bankruptcy court's statutory authority and wrongly collapses trial-management concerns into case-conversion authority. Any perceived shortcomings in the CRO's testimony certainly did not diminish the estate, and it would elide the line between judicial supervision and business judgment to turn trial testimony itself into a ground for "cause." Decisions whether to investigate, pursue, or settle estate claims are quintessential exercises of the fiduciary's judgment. *See In re Black Elk Energy Offshore Operations, LLC*, 2016 WL 4055044, at *2 (Bankr. S.D. Tex. July 26, 2016). While the bankruptcy court may police controversies and approve settlements, it may not substitute its own view about whether to bring claims or negotiate settlements. *In re Patriot Place, Ltd.*, 486 B.R. 773, 826 (Bankr. W.D. Tex. 2013). Plainly, the CRO's testimony cannot constitute cause under the Bankruptcy Code.

Third, no evidence supports the bankruptcy court's lack-of-candor finding, making it clearly erroneous and further defeating this ground. The court's finding was linked to its belief the CRO was seeking to "shield from the Court his communications with [Dr.] McGraw regarding the emergency request to dismiss the case." MR8955–56. Tellingly, the court cited nothing in the record supporting that belief. Instead, the court cited the CRO's alleged discomfort and pauses during questioning by the court as "evidence" in support of this finding. But that was wrong: these sorts of non-verbal aspects of testimony cannot be dispositive for such a legally consequential finding. *See, e.g.*, *United States v. Smith*, 2024 WL 516677, at *1 (E.D. Mo. Feb. 9, 2024) (pausing before answering questions under oath "is not inherently suspicious"). And the CRO's alleged

hesitation could easily be attributed to the court asking questions focused on internal, privileged deliberations with counsel. *See, e.g.*, MR4327. Even a seasoned professional must go slow and be careful not to disclose attorney–client communications while answering a court's questions. Particularly given these circumstances, the CRO's careful manner of responding is no evidence of a lack of candor. *See Smith*, 2024 WL 516677, at *1.

The bankruptcy court also plainly misread the CRO's testimony. Specifically, the Ruling states that when the court "asked [the CRO] directly whether he ever had such a communication, he first denied it and then said he couldn't remember." MR8955. While the Ruling's phrase "such a communication" is unclear, it appears to refer to a communication between Dr. McGraw and the CRO regarding dismissal. But that misunderstands the testimony because the CRO never denied a communication and then claimed not to remember it. Instead, he was asked two different questions: First, he was asked whether "[Dr.] McGraw consult[ed] with you or did you talk with him about that consent to dismissal," and the CRO responded: "I don't think so. I would have to look at the board meeting minutes, but I know I talked a lot with our restructuring advisors on that." MR4326–27. The court then asked a similar, but distinct, question: "Was there communication between [Dr.] McGraw on his side and you on the other side regarding dismissal versus conversion?" MR4327. The CRO responded: "I don't remember. I remember talking to our restructuring advisors, but I don't remember them channeling any message from" Dr. McGraw. *Id.* Both answers reflect a consistent inability to remember clearly the details of telephonic meetings three months prior, rather than a denial followed by a claim to not remember the same fact. The court rested ground 3 on a clearly erroneous view of the facts.

The bankruptcy court also erred by relying on the CRO needing to see board minutes to refresh his recollection. Once the CRO reviewed the minutes of the board meeting, he firmly stated

no conversation with Dr. McGraw took place in which Dr. McGraw directed him to seek dismissal or conversion, explaining he made that decision himself. MR4334. The CRO also testified that substantive deliberations occurred in a subsequent special-committee session that did not include Dr. McGraw or any Peteski representative or counsel. MR4332, 4335. The minutes themselves corroborate this testimony. *See* MR6139–56. And the bankruptcy court's comparison of a company board meeting to imposing the death penalty highlighted the absurdity of the court's reliance on this ground, MR9476, as the CRO simply needed to review the minutes from one of two meetings that day to remember who was present and what was discussed at each one—exactly the purpose of meeting minutes. All of this was clear error.

The Ruling suggests the CRO violated his duty of candor by "either looking out for [Dr.] McGraw's personal interests or taking direction from [Dr.] McGraw." MR8964. But this does not follow from the proposed releases under MSM's Chapter 11 Plan, *see* MR8965, which have little to no connection to what the court asked the CRO and were a result of arms-length negotiations for the benefit of all stakeholders. *See* MR2218–20. They offer no evidence of lack of candor.

In sum, no evidence contradicted the CRO's consistent testimony he never "yield[ed] to a demand from [Dr.] McGraw to dismiss the case," MR8948, and he acted only to advance MSM's interests. *See, e.g.*, MR4135, 4261–63 4266, 4269–69 4286–87, 4294–95. If the bankruptcy court did not find the CRO's testimony credible, it could disregard it. *Bose*, 466 U.S. at 512. But its discretion ended there and legally could not include making this a cause ground or treating as affirmative evidence the *opposite* of the testimony. Ground 3—and indeed ground 2, explained next—are therefore clearly erroneous both legally and factually, constituting a clear abuse of discretion justifying mandamus relief. Vacatur is warranted, and all statements and findings in the bankruptcy court's various orders related to the CRO determinations should be stricken from the

36

public record because the disparaging comments about the CRO are just the type of "unwarranted judicial excesses" that merit not just reversal of the decision but also expunging the public record. *E.g.*, *In re Williams*, 156 F.3d at 92–93; *see also supra* Section II.A.4.

### C.    Ground 2—neutrality of the chief restructuring officer—is legally flawed, rests on clearly erroneous fact findings, and is otherwise an abuse of discretion.

Also relating to the CRO, the bankruptcy court found as "[t]he second cause for conversion or dismissal: The CRO is not a neutral fiduciary but instead is conflicted in favor of [Dr.] McGraw . . . ." MR8963. The bankruptcy court offered as support the CRO's "work for Envoy after the petition date, his blessing of the other Merit Street officers' work for Envoy after the petition date, and his disastrous attempt to shield from the Court his communications with [Dr.] McGraw regarding dismissal or conversion of this case."[2] MR8963. But the court *never* explained how any of this could provide cause under the Code or the pleadings—and it cannot. Further, the "evidence" cited in support either is not in the record or the court misinterpreted it; in either case, the finding is clearly erroneous. *See id.*; *Bd. of Trs. v. Gabriel, Roeder, Smith & Co.*, 529 F.3d 506, 509 (5th Cir. 2008). This asserted cause ground relies on clearly erroneous factual findings and flawed legal conclusions or analyses. *See McClure*, 335 F.3d at 408.

First, the bankruptcy court's finding that the CRO worked for Envoy after the petition date is clearly erroneous—there is literally no evidence to support it. The record shows the CRO only ever acted to advance MSM's interests and has *not* worked for Envoy. *See* MR4282, 4294–95. No litigant asserted the CRO worked for Envoy (much less that this could provide "cause"), but it appears the bankruptcy court based this finding on one email the CRO responded to about an

---

[2] Envoy Media Company is a content-creation and distribution company founded by Dr. McGraw, aimed at delivering news, original entertainment, and immersive viewer experiences through AI-powered technology that personalizes the viewing experience. *See* MR4203–04.

Envoy press release. *See* MR4206. But that disregards the CRO's clear testimony that he responded to that press release only "from a Merit standpoint." *Id.* That testimony directly rebuts any finding he was acting on behalf of or working for Envoy when he approved the post-filing press release, and there was no basis to discredit his justification that "he knew the transaction was going to be scrutinized so it was better to have Merit Street informed of what was going on at Envoy rather than be taken by surprise." MR8945–46. Further, there is no evidence that the CRO drafted the release, was directed by Envoy, or was compensated by Envoy in connection with it. This finding that the CRO worked for Envoy cannot stand.

Second, reliance on the CRO's "blessing" of other Merit Street officers' work for Envoy was legally flawed and clearly erroneous because the CRO's actions reflected a rational business decision. The Ruling described the CRO's decision to let certain officers work for Envoy as not "the greatest business judgment." MR8947. But "a 'hallmark of the business judgment rule is that a court will not substitute its judgment for that of the board if the latter's decision can be attributed to any rational business purpose." *Hartman Comm. Props. REIT v. Hartman*, 2007 WL 9751970, at *4 (S.D. Tex. Apr. 6, 2007) (citation omitted), *aff'd*, 252 F. App'x 631 (5th Cir. 2007). This finding therefore sprung from a faulty legal foundation.

The Memorandum Decision compounded the error by calling it "inappropriate" for the officers to work at Envoy, citing, as a basis for suggesting the CRO needed to request prior court permission, 11 U.S.C. § 363(b) (requiring permission to use, sell, or lease property of the estate outside ordinary course of business) and 11 U.S.C. § 363(c) (allowing trustee/debtor to enter into transactions without approval only if in ordinary course of business). *See* MR9477–78. But MSM's employees are not property of the estate, so Section 363(b) does not apply. And Section 363(c) does not apply because the Debtor did not enter into any transactions outside the ordinary course.

The CRO simply gave permission for certain MSM reduced-hour employees to also work for Envoy, which is not a transaction that involved MSM because those are transactions between those individuals and Envoy. No law supports that the CRO needed court permission before allowing reduced-hours employees to take a second job; rather, such rational business decisions may not be substituted with the bankruptcy court's preferences.

Nor is the bankruptcy court's misguided second-guessing justified on the merits. *See* MR9477–78 & n.11. Given the wind down of MSM, the CRO capped officers to 15 hours a week to realize savings through reduced wages and benefits. MR4283. But the CRO could not risk losing the CEO and COO's institutional knowledge and expertise, so he authorized them to supplement their reduced salaries by working elsewhere. *See* MR4206–07. Further, the CRO testified that Envoy was not a competitor, so he did not see a conflict. *See* MR4301, 4303. The CRO made a rational business decision. The bankruptcy court's contrary conclusion is unsupported by the facts and contravenes the business judgment rule.

Third, the court's finding that the CRO tried to shield communications with Dr. McGraw regarding dismissal or conversion of the bankruptcy case, which also ties to the alleged lack of candor, is legally flawed and clearly erroneous as explained above. *See supra* Section II.B. This ground also constitutes error because, as factfinder, the court's discretion to credit testimony (or not) did not extend to discretion to generate as fact the *opposite* of uncredited testimony. *See Bose*, 466 U.S. at 512. Accordingly, the court legally erred and made a clearly erroneous finding by deciding—without any evidence contrary to the CRO's testimony—that by disbelieving the CRO's testimony, it meant the CRO was *not* neutral and he *in fact* took direction from Dr. McGraw. The court relied on invalid assumptions rather than evidence, and thus the Ruling's cause ground 2 (not to mention ground 3) is invalid and cannot support conversion or any other relief.

Fourth, even if the evidence could support this finding, the bankruptcy court still erred in finding that lack of neutrality is a cause ground. The paradigm for "cause" under the statute is protection of the estate for the benefit of the creditors. *See* 11 U.S.C. § 1112(b)(4)(A)–(P). None of the *enumerated* grounds relate to a CRO's purported neutrality as a stand-alone ground. And the bankruptcy court cited no legal basis to justify the alleged lack of neutrality as unenumerated cause to convert under Section 1112. Accordingly, this finding also constitutes legal error.

Finally, the evidence strongly supports that the CRO was a neutral, independent fiduciary by separating MSM's restructuring decision-making from insider influence and exercising his own judgment for the estate. The CRO retained Sidley Austin LLP as MSM's counsel, emphasizing the need for counsel to "focus[] on exclusively the benefit of Merit Street," and led meetings with Sidley and MSM's financial advisor that framed fiduciary duties, options, bridge financing, and DIP financing on MSM's side of the table. MR4315, 4261–63, 4266, 4268–69, 4286–87, 4294–95. The CRO testified he alone made the decision to file Chapter 11 based on his experience and the advisors' input, and that no one, including Dr. McGraw, instructed or directed him to file. MR4271. The CRO also explained his business judgment decisions designed to protect estate value, including limiting and capping dual-role executives' work for MSM while ensuring continuity during a wind-down, and independently evaluating and approving the DIP financing with the expectation it would be market-tested. MR4266–67, 4306–07. Dr. McGraw corroborated the CRO's independence, testifying he did not know the CRO beforehand, imposed no limits on the CRO's work, did not direct the filing of the Chapter 11 case, and deferred to the CRO and counsel for decision-making. MR7952–53, 8047–49.

Based on the record and the law, cause ground 2 was patently erroneous. *See Volkswagen*, 545 F.3d at 310. It is legally flawed and supported by no evidence, constituting a clear abuse of

discretion justifying mandamus relief. Vacatur is warranted, and all statements and findings in the bankruptcy court's various orders related to the CRO's neutrality should be stricken from the public record because the disparaging comments about Dr. McGraw, Peteski, and the CRO are just the type of "unwarranted judicial excesses" that merit not just reversal of the decision but also expunging the public record. *E.g.*, *In re Williams*, 156 F.3d at 92–93; *see also supra* Section II.A.4.

### D. Ground 1 also is legally flawed, rests on clearly erroneous fact findings, and is otherwise an abuse of discretion.

The bankruptcy court's ground 1 is the only one that attempts to root itself in an enumerated statutory ground for cause: Section 1112(b)(4)(A). But even those findings and conclusions are a clear abuse of discretion, producing a patently erroneous result. *Volkswagen*, 545 F.3d at 310.

The court found that negative cash flow, and a plan to liquidate, were sufficient to show "absence of a reasonable likelihood of rehabilitation" under Chapter 11. *See* MR8961–62. That is legally wrong. "Chapter 11 . . . permits a debtor to reorganize or liquidate all or substantially all of its assets." *CHS, Inc. v. Plaquemines Holdings, L.L.C.*, 735 F.3d 231, 238 (5th Cir. 2013); 11 U.S.C. § 1123(b)(4).[3] "'Rehabilitation' is not synonymous with 'reorganization' . . . or else Congress would have used the word 'reorganization' in § 1112. 'Rehabilitation,' as it is used in § 1112, is better read as encompassing a debtor's intention to use the bankruptcy process to prevent a complete and total loss of value." *In re HONX*, 2022 WL 17984313, at *3 (citations omitted).[4]

---

[3] *See also, e.g.*, *In re HONX, Inc.*, 2022 WL 17984313, at *3 (Bankr. S.D. Tex. Dec. 28, 2022) ("[S]ometimes, a plan of liquidation is better for all parties than attempting to salvage the business as an ongoing matter or allowing the provisions of chapter 7 or a race to the courthouse to dictate the liquidation process."); *In re Soundview Elite, Ltd.*, 503 B.R. 571, 580 (Bankr. S.D.N.Y. 2014) ("[I]t is not bad faith to file a chapter 11 petition for the purpose of a more orderly liquidation."); *Loop Corp. v. U.S. Tr.*, 379 F.3d 511, 517 (8th Cir. 2004).

[4] *See also, e.g.*, *In re Red River Talc LLC*, 670 B.R. 251, 305 (Bankr. S.D. Tex. 2025) ("[T]his Court conducted an on-the-spot analysis to determine whether Red River filed for bankruptcy to pursue a valid bankruptcy purpose. The Court uses the phrase 'bankruptcy purpose' and not the phrase 'reorganization purpose' intentionally because not every chapter 11 debtor

Indeed, a Chapter 11 liquidation plan cannot be confirmed unless it would give creditors "at least" what they would have received in Chapter 7. *CHS, Inc.*, 735 F.3d at 240.

If, as the bankruptcy court concluded, a Chapter 11 liquidation plan lent support to finding cause under Section 1112(b)(4)(A), then *every* Chapter 11 liquidating debtor would be subject to conversion or dismissal, which is absurd and contradicts the plain text of Section 1123 that allows Chapter 11 liquidations. *See In re HONX*, 2022 WL 17984313, at *3; *In re BMI Oldco*, 671 B.R. at 221. The bankruptcy court not only refused to acknowledge the validity of this case law recognizing that rehabilitation can encompass liquidation, it misguidedly insisted that applying the correct law "doesn't change the result here." MR9475.

Beyond that clear legal error, courts do not have unbounded discretion to ignore facts or misapply law to the facts. *See McClure*, 335 F.3d at 408. Here, the court disregarded that:

- Debtor filed the Chapter 11 liquidating case in good faith; despite Trinity and PBR challenging Debtor's good faith at the time of filing, the bankruptcy court never held otherwise.

- Debtor *increased* revenue during the case through renegotiated agreements, which, along with post-petition financing, supported the business and preserved estate value for an orderly liquidation (*see* MR7975–76).

- The estate possesses claims against Trinity and PBR that could generate additional recovery (*see* MR486).

- Even as MSM was forced to incur extensive, unnecessary expenses that drained the estate in fighting Trinity's and PBR's motions to dismiss, it reached agreement with the Official Committee of Unsecured Creditors on the Chapter 11 Plan (MR2213–23).

- That Chapter 11 Plan included proposed releases maximizing the value of the estate that were the result of arms-length negotiations (*id.*).

---

rehabilitates. In fact, some debtors liquidate and create trusts to benefit creditors."); *In re BMI Oldco*, 671 B.R. 215, 221 (Bankr. S.D. Tex. 2025); *In re Profundity LLC*, 2024 WL 4249715, at *1 (Bankr. S.D. Fla. Apr. 11, 2024); *In re MatlinPatterson Glob. Opportunities Partners II L.P.*, 644 B.R. 418, 436 (Bankr. S.D.N.Y. 2022); *In re Modern VideoFilm, Inc.*, 2019 Bankr. LEXIS 3317, at *13–14 (Bankr. C.D. Cal. Sep. 26, 2019).

- Chapter 7 liquidation would provide unsecured creditors with an estimated recovery of between 3.4% and 11.5%, whereas the proposed Chapter 11 Plan's monetization projects unsecured recoveries of between 29.5% and 37.7% (MR2988).

Trinity and PBR offered no contrary analysis to any of this.

The bankruptcy court admitted it gave "little or no weight" to the analysis of greater recovery in Chapter 11 because it claimed Debtor's financial advisor "can't possibly know the value of the estate's claims." MR9475. But the court cannot permissibly reach this conclusion without a full and fair opportunity for Debtor to be heard on the Chapter 11 Plan—which never happened. Indeed, the bankruptcy court refused to permit Debtor to fully present the Chapter 11 Plan and details of a brokered settlement before reaching its clearly erroneous determinations. *See* MR4316–17; MR2207–23. Instead, to prop up its unfounded conclusion that creditors would be better off under Chapter 7, the court speculated there was "no reason . . . a functionally equivalent settlement" could not be reached with the Chapter 7 trustee. MR9481. The court cited no evidence in support of this speculation. For its part, after the trial on Trinity's and PBR's motions to dismiss, counsel for the Official Committee of Unsecured Creditors stated: "a dismissal or conversion or appointment of a trustee in this case is not in the best interests of unsecured creditors." MR8793.

Even more troubling, although the court never held a hearing on the Chapter 11 Plan, it candidly admitted "there is nearly zero chance the [c]ourt would confirm." MR9481. Having ignored the relevant evidence and refused to fully hear the Chapter 11 Plan, the court nevertheless prejudged the Plan and concluded it could not "find on this record that creditors would fare better under the plan than under Chapter 7." MR8971; *see also* MR9475, 9481.

These are clear abuses of discretion: legal error, deciding issues without a full and fair hearing, ignoring facts that do not fit the court's conclusion, speculating about future events, and insisting that even the *right* standard yields the same result. *See McClure*, 335 F.3d at 408; *In re Volkswagen*, 545 F.3d at 318. And the result—converting the case to Chapter 7 where projected

43

recoveries are orders of magnitude lower than under the Chapter 11 Plan—is patently erroneous. *See Volkswagen*, 545 F.3d at 310. Mandamus is warranted.

## III.    Mandamus relief is appropriate under the circumstances of this case.

Whether the writ "is appropriate under the circumstances" can be decided based on the other two factors. *See id.* at 309 (after finding clear abuse of discretion and that "the showing satisfies the other requirements of the Supreme Court for mandamus," the court "conclude[d] that a writ is appropriate under the circumstances of this case"); *see also id.* at 319.

Here, the bankruptcy proceeding was replete with legal errors, due-process violations, and other failures to follow the law and record, among other errors; thus, the abuses of discretion are clear. *See supra* Parts I–II. And mandamus relief may be "particularly appropriate" when petitions present issues that "also have an importance beyond the immediate case," such as an opportunity to provide guidance on legal issues to lower courts. *Volkswagen*, 545 F.3d at 319. Here, that guidance includes reminding bankruptcy courts they must provide due process, follow the party-presentment rule, and abide the guidance and limitations on "cause" under the Bankruptcy Code. Without such guidance, courts elsewhere may feel emboldened by the bankruptcy court's actions in this litigation to rove beyond the bounds of their authority and the record in future cases.

Moreover, as described below in Part IV, mandamus is the only appropriate vehicle for seeking the relief of an order to strike specific portions of the orders below that improperly and unnecessarily attack non-parties Dr. McGraw and Peteski. Mandamus is appropriate under the circumstances of this case for this reason as well.

## IV.    Mandamus is warranted because there is not an adequate appellate remedy.

Mandamus is available when an "error is irremediable on ordinary appeal," *In re Avantel, S.A.*, 343 F.3d 311, 317 (5th Cir. 2003), and thus the petitioner has "no other adequate means to attain the relief [it] desires." *Cheney*, 542 U.S. at 380. Mootness is one basis for finding no other

adequate means of obtaining relief. *See In re JPMorgan Chase & Co.*, 916 F.3d 494, 499 (5th Cir. 2019). Further, although Petitioners have requested and believe that the district court presiding over the appeal should grant a stay pending appeal, the law is clear that no adequate appellate remedy exists if that court denies that stay relief from the bankruptcy court's orders. *In re First S. Sav. Ass'n*, 820 F.2d 700, 708 (5th Cir. 1987). And mandamus is available to expunge a court's "offending commentary" from the public record. *In re Williams*, 156 F.3d at 92. Each of these bases provides a possible avenue for the court to award the mandamus relief sought here.

*First*, Petitioners cannot obtain full relief by appeal—even if they have appellate rights generally—because they seek to strike portions of the bankruptcy court's rulings and findings in various opinions, and they also seek at least *partial* vacatur. *See In re Williams*, 156 F.3d at 92–93; *U.S. Lines Co.*, 285 F.2d at 212. Petitioners, especially Dr. McGraw, face reputational and brand harm due to the court's clearly erroneous Conversion Order, Ruling, Memorandum Decision, and Due-Process Hearing Order that likely cannot be fully vindicated through the appellate process.

As explained above, the bankruptcy court did more than simply discredit the testimony of Dr. McGraw and the CRO. And it went well beyond misusing those credibility determinations to create and rely on "facts" for which there was literally *no* evidence, e.g., that Dr. McGraw deleted a personal email, much less intentionally or to destroy estate property or as an act of bad faith in the bankruptcy proceeding. Likewise, the court not only misread the CRO's testimony to find it contradictory but misused it as somehow evidencing lack of neutrality. The court did worse than all this: the Conversion Order, Ruling, Memorandum Decision, Due-Process Hearing Order, and other decisions made numerous inflammatory and erroneous attacks on Dr. McGraw and Peteski (and the CRO). *See, e.g.*, MR9465 (claiming Dr. McGraw "deleted the text because it contained highly relevant and unfavorable evidence about [Dr.] McGraw's inappropriate goals in this case");

MR8904 ("[T]his case . . . has been plagued with the attempted destruction of evidence and less-than-truthful testimony by some of the key players."), 8919 (claiming that Dr. McGraw "purposefully deleted [the text] after the bankruptcy because he didn't want me to see it"), 8935 ("The problem is that neither Peteski nor the Debtor ever produced the original unflattering text message from [Dr.] McGraw to Mr. Ribman."). Not only are these comments unfounded in the evidentiary record, they are highly offensive and have caused and will continue to cause reputational and brand damage to Dr. McGraw and separately also to Peteski—directly for attacks against it, and indirectly as an entity owned by Dr. McGraw—if not stricken. These comments also risk other serious collateral consequences for Petitioners, in light of ongoing discovery sanctions disputes and of adversary litigation by Trinity and PBR pending in the bankruptcy court. Accordingly, all disparaging and improper comments about Dr. McGraw, Peteski, and the CRO in the rulings and findings under review should be expunged from the public record in the bankruptcy litigation to fully vindicate Petitioners and to remedy the reputational and brand harm that they each suffer as a result of these unfounded remarks.

Mandamus is generally the appropriate vehicle to obtain this type of relief. *E.g.*, *In re Williams*, 156 F.3d at 92–93 (noting that mandamus is available to "request that offending commentary be expunged from . . . public record[s]," such as "critical comments made in the course of a trial court's . . . factfinding or opinion writing"); *see also Nisus Corp. v. Perma-Chink Sys., Inc.*, 497 F.3d 1316, 1321–22 (Fed. Cir. 2007) (mandamus is available when "an individual is harmed by the mere existence of a statement in an opinion"); *Gardiner*, 747 F.2d at 1188 n.11, 1190–94 (striking from public record trial court's unjustified comments condemning corporate officers); *cf. Fromson*, 886 F.2d at 1304 (mandamus is appropriate means to strike derogatory comments from a court's opinion, but interpreting Second Circuit as implicitly permitting an

appeal). Mandamus in this context still requires a clear and indisputable right to relief, *In re Williams*, 156 F.3d at 93, but Petitioners have amply demonstrated the proceedings below were replete with clear abuses of discretion that were supported largely, and at times *only*, by the court's disparaging comments about Dr. McGraw, Peteski, and the CRO. Mandamus relief "is available to correct unwarranted judicial excesses" attacking Dr. McGraw, Peteski, and the CRO in the Conversion Order, Ruling, Memorandum Decision, and Due-Process Hearing Order. *Id.*

Mandamus is also an appropriate vehicle for Petitioners' requests for partial vacatur of the court's orders and rulings. *See, e.g.*, *U.S. Lines Co.*, 285 F.2d at 212 (granting mandamus to strike specific language from order). In an appeal, a district court considers whether to affirm or reverse the bankruptcy court's orders. *In re Salem Suede, Inc.*, 221 B.R. 586, 594 (D. Mass. 1998). While Petitioners challenge the court's orders in their entirety based on clear abuses of discretion producing a patently erroneous result—and will also challenge the orders in their appeal—in the alternative, they seek at least partial vacatur of the portions of the court's orders and rulings that are found to be a clear abuse of discretion and that have serious collateral consequences for Petitioners. This form of relief is available by mandamus. Given the independent reputational and brand harms to Dr. McGraw and separately Peteski, and given the ongoing discovery disputes and adversarial proceedings against Peteski and Dr. McGraw in the bankruptcy court that also threaten independent harms, the court's adverse findings related to Petitioners in grounds 2–4, especially ground 4, risk serious, negative collateral consequences. These include not only the direct collateral injury to Dr. McGraw's and Peteski's reputations and brands, but also—among other possible collateral consequences—the possibility of discovery sanctions and Trinity and PBR's weaponization of the court's findings in their adversarial proceedings.

Accordingly, even if the Court agrees with Petitioners that they have a right to appeal the orders under review and that nothing moots those appellate rights—issues addressed next—the collateral consequences from the rulings and comments below, including the reputational and brand harms to Dr. McGraw and also Peteski, remain "susceptible to judicial correction." *Pulphus*, 909 F.3d at 1154; *see also McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords. of Jud. Conf.*, 264 F.3d 52, 56–57 (D.C. Cir. 2001). Whatever the outcome of Petitioners' appeal, this mandamus should be granted to afford Petitioners the relief requested here by mandamus.

*Second*, there is also no adequate appellate remedy because of serious risk that Petitioners will be precluded from obtaining *any* relief in their appeal. Trinity and PBR have already argued that Peteski (a creditor) and Dr. McGraw lack prudential standing to appeal the bankruptcy court's orders under the "more exacting" "person aggrieved" standard in bankruptcy matters. *In re Highland Capital Mgmt., L.P.*, 74 F.4th 361, 366 (5th Cir. 2023) (citation omitted); *see* Peteski Dkt. 22 at 6–9, 27; MSM Dkt. 23 at 25–26. If the district court in the appeal agrees with Trinity and PBR that Peteski and Dr. McGraw lack standing to appeal the bankruptcy court's orders, thereby preventing them from pursuing *any* remedies by appeal, then Petitioners would have *no* adequate appellate remedy for obtaining relief from the bankruptcy court's orders. Petitioners disagree with Trinity and PBR's standing objections, but the mere presence of those objections at least warrants allowing this mandamus action to proceed in parallel with Peteski's and Dr. McGraw's appeals. That is especially true because the standing analysis is not identical as between Peteski and Dr. McGraw, such that—for example—finding that Peteski has standing does not erase Dr. McGraw's need for mandamus relief if he is somehow found to lack appellate standing.

*Third*, even if both Petitioners currently have prudential standing to appeal, if the district court denies their motion seeking a stay pending appeal, then a Chapter 7 liquidation will proceed

48

imminently and lead to actions that cannot be unwound. If that occurs, Trinity and PBR likely will argue that equitable or constitutional mootness destroys Petitioners' rights to appeal before the appeal can be fully briefed, argued, and decided. *See* Peteski Dkt. 22 at 27; MSM Dkt. 23 at 50.

Petitioners disagree that this case could become moot. First, equitable mootness should not apply in Chapter 7 conversion cases. *See In re San Patricio Cnty. Comm. Action Agency*, 575 F.3d 553, 558 (5th Cir. 2009); *see also In re Bodenheimer, Jones, Szwak, & Winchell L.L.P.*, 592 F.3d 664, 669–70 (5th Cir. 2009) (appeal not moot despite "fact that the [Chapter 7] liquidation [had] been substantially consummated"). And second, the reputational harm to Peteski and Dr. McGraw caused by the bankruptcy court's decision "may constitute an ongoing, redressable injury" because many of the court's comments about Petitioners were "inherently stigmatizing." *Pulphus*, 909 F.3d at 1153; *see also Dailey*, 141 F.3d at 227–28, 231 ("collateral consequences" from court order may persist, such that "the violation in question may cause continuing harm," and mandamus may be "capable of preventing such harm"). Any mootness argument would therefore be misguided.

But again, the mere presence of potential mootness arguments at least warrants allowing this mandamus action to proceed in parallel with Peteski's and Dr. McGraw's appeals. Indeed, if the district court were to deny the pending motions for stay pending appeal, that alone could be enough to give Petitioners no other adequate means to obtain relief. *See In re First S. Sav. Ass'n*, 820 F.2d at 708. A successful appeal cannot unwind a Chapter 7 trustee's liquidation actions or effectuate the Chapter 11 Plan negotiated and supported by the Official Committee of Unsecured Creditors. *See In re Carr*, 321 B.R. 702, 707–09 (E.D. Va. 2005) (explaining potential applications of equitable and constitutional mootness to Chapter 7 cases). Absent a stay, Trinity and PBR likely will argue that Petitioners' appeal has become equitably or constitutionally moot once the Chapter 7 proceedings commence, either of which could deny Petitioners adequate appellate means to

obtain relief. *See In re JPMorgan Chase*, 916 F.3d at 499. While Petitioners certainly disagree with any such arguments, Trinity and PBR have declined to state whether they will make them, Peteski Dkt. 22 at 27; MSM Dkt. 23 at 50. That silence confirms the danger to Petitioners of arguments that they have lost all appellate rights before their appeal can be fully litigated.

In sum, there is ample basis for mandamus relief here, and certainly for allowing this mandamus petition to proceed in parallel to Petitioners' pending appeals. Dr. McGraw and Peteski do not have adequate appellate means for obtaining all requested relief. And due to Trinity's and PBR's contentions so far, there is credible risk that Petitioners cannot obtain any meaningful appellate relief. This is precisely the circumstance where a mandamus petition is proper.

**PRAYER**

For these reasons, Petitioners respectfully request that the Court grant this mandamus petition and award the following relief by issuing appropriate orders to the bankruptcy court: (1) reverse or vacate the bankruptcy court's Conversion Order and all underlying or related orders, rulings, findings, and conclusions, either in full—and thus reverse the decisions below, deny the motions to dismiss in their entirety, and remand for Chapter 11 proceedings—or alternatively in part; (2) strike or vacate each of the cause grounds asserted by the bankruptcy court; and (3) strike, vacate, and/or expunge all statements and findings by the court in the Conversion Order, Ruling, Memorandum Decision, Due-Process Order, and other decisions that (a) relate to Dr. McGraw's alleged deletion of a text message, (b) relate to Dr. McGraw's or Peteski's alleged actions in relation to the filing of or prosecution of this bankruptcy case, (c) relate to the chief restructuring officer's supposed lack of neutrality or candor as it concerns Dr. McGraw, or (d) otherwise support "cause" grounds 2–4.

Respectfully submitted,

Dated: December 23, 2025

/s/ *Christopher Bankler*
Charles L. Babcock (TBN 01479500)
Christopher Bankler (TBN 24066754)
Minoo S. Blaesche (TBN 24075102)
JACKSON WALKER LLP
2323 Ross Avenue, Suite 600
Dallas, TX 75201
Telephone: (214) 953-6000
Email: cbabcock@jw.com
Email: cbankler@jw.com
Email: mblaesche@jw.com

Bruce J. Ruzinsky (TBN 17439425)
Matthew D. Cavenaugh (TBN 24062656)
JACKSON WALKER LLP
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone: (713) 752-4200
Email: bruzinsky@jw.com
Email: mcavenaugh@jw.com

Nathan L. Hecht (TBN 00000023)
Jeffrey L. Oldham (TBN 24051132)
Adam W. Aston (TBN 24045423)
JACKSON WALKER LLP
100 Congress Avenue, Suite 1100
Austin, TX 78701
Telephone: (512) 236-2000
Email: nhecht@jw.com
Email: joldham@jw.com
Email: aaston@jw.com

*Counsel for Petitioners Peteski Productions,*
*Inc. and Phillip C. McGraw, PhD*

CERTIFICATE OF SERVICE

I certify that a copy of this petition was served on counsel of record listed below, via electronic service, on December 23, 2025:

Hon. Scott W. Everett
United States Bankruptcy Judge
Earle Cabell Federal Building
1100 Commerce Street, Room 1421
Dallas, TX 75242-1496
(214) 753-2071
swe_settings@txnb.uscourts.gov

Stephen E. Hessler
Patrick Venter
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
shessler@sidley.com
pventer@sidley.com

James W. Ducayet
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL
Telephone: (312) 853-7000
jducayet@sidley.com

Thomas Califano
Jeri Leigh Miller
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400
tom.califano@sidley.com
jeri.miller@sidley.com

Mark C. Moore
FOLEY & LARDNER, LLP
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-4150
mmoore@foley.com

Rajiv Dharnidharka
FOLEY & LARDNER, LLP
555 California Street, Suite 1700
San Francisco, CA 94104
Telephone: (415) 434-4484
rajiv.dharnidharka@foley.com

Jason M. Rudd
WICK & Phillips Gould & Martin, LLP
3131 McKinney Avenue, Suite 500
Dallas, TX 75204
Telephone: (214) 692-6200
jason.rudd@wickphillips.com

Alyssa A. Moscarino
BENESCH, FRIEDLANDER, COPLAN & ARNONOFF
127 Public Square, Suite 4900
Cleveland, OH 44144
Telephone: (216) 363-4500
amoscarino@beneschlaw.com

Greg Wilkes
Lou Strubeck, Jr.
O'MELVENY & MYERS, LLP
2801 North Harwood Street, Suite 1600
Dallas, TX 75201-2692
Telephone: (972) 360-1935
gwilkes@omm.com
lstrubeck@omm.com


Asher Bublick
Elizabeth A. Young
Kendra Rust
Meredyth Kippes
Susan Hersh
Erin Schmidt
OFFICE OF THE UNITED STATES TRUSTEE
1100 Commerce Street, Room 976
Dallas, TX 75201
Telephone: (214) 767-8967
asher.bublick@usdoj.gov
Elizabeth.a.young@usdoj.gov
kendra.rust@usdoj.gov
Meredyth.kippes@usdoj.gov
susan.hersh@usdoj.gov
erin.schmidt2@usdoj.gov
ustpregion06.da.ecf@usdoj.gov

Daniel J. Sherman
SHERMAN & YAQUINTO, LLP
509 N. Montclair Ave.
Dallas, TX 75208
Telephone: (214) 942-5502
djsherman@syllp.com

/s/ *Christopher Bankler*
Christopher Bankler